Present:  All the Justices

PMA CAPITAL INSURANCE COMPANY

v.  Record No. 051179        OPINION BY JUSTICE DONALD W. LEMONS
                                      March 3, 2006
US AIRWAYS, INC., ET AL.

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Joanne F. Alper, Judge

This appeal involves a claim for compensation for business interruption losses arising from the September 11, 2001 terrorist attack on the United States of America.  In this appeal, we consider whether the trial court correctly interpreted and applied the provisions of an insurance contract.  For the reasons discussed below, the judgment of the trial court will be reversed.

I.  Facts and Proceedings Below

US Airways, Inc., Allegheny Airlines, Inc., Piedmont Airlines, Inc., PSA Airlines, Inc., and MidAtlantic Airways, Inc., ("US Airways") entered into an "All Risk Manuscript Property Policy" ("Policy") subscription insurance contract with six insurance providers.  The Policy provided commercial property coverage in the amount of twenty-five million dollars ($25,000,000.00) from December 1, 2000, through December 1, 2001.  The six insurance providers provided varying percentage amounts of coverage and, of the six, only one, PMA Capital Insurance Company ("PMA"), is involved in the present appeal.

PMA is the successor in interest to one of the original subscribers, Caliber One Indemnity Company, which underwrote 10% of the twenty-five million dollars in coverage.

On the morning of September 11, 2001, terrorists hijacked several commercial aircraft flying within the airspace of the United States.  Shortly after two of the aircraft were crashed into the World Trade Center in New York City, the Federal Aviation Administration ("FAA") issued a "Notice to Airmen" ("NOTAM" or "ground stop order") ordering all civilian aircraft to land or stay on the ground.  After a similar attack on the Pentagon, the airport manager for the Metropolitan Washington Airport Authority ("MWAA"), Christopher U. Brown, ordered the evacuation and closure of Ronald Reagan Washington National Airport ("Reagan National Airport").  Although other airports around the country were permitted to resume operations within several days after the attacks, the FAA issued a Temporary Flight Restriction which closed the air space within 25 nautical miles of Reagan National Airport.  Because of this FAA order, the MWAA closed the Reagan National Airport facility and restricted access to the facility for approximately two weeks.  As a result, US Airways was not permitted to conduct commercial flights into or out of Reagan National Airport during the period from September 11 to October 4, 2001.

US Airways made a claim under the Policy for business interruption losses and PMA denied coverage. US Airways then filed its initial motion for judgment on August 12, 2003. It was amended twice, and the second amended motion for judgment formed the basis of the litigation in the trial court below. US Airways sought a declaratory judgment that PMA was obligated under the Policy to indemnify for business interruption losses suffered by US Airways as a result of the ground stop order issued by the FAA and the Reagan National Airport closure order issued by the MWAA, damages from PMA for breach of the terms of the Policy, and damages from PMA for breach of its "implied covenant of good faith and fair dealing." PMA filed an answer and grounds of defense. Subsequently, PMA moved for summary judgment and US Airways moved for partial summary judgment.

According to the trial court, PMA's motion for summary judgment presented four issues:

> 1. Whether the civil authority orders upon which US Airways bases its business interruption claim are a peril covered under the Policy;
> 2. Whether US Airways can claim a loss of market share under the Policy;
> 3. Whether US Airways' claim should be barred for failure to submit a proof of loss for all the components of their claim; and
> 4. Whether US Airways can maintain a claim against PMA for breach of the covenant of good faith and fair dealings under Virginia law.

3

The trial court denied summary judgment on the first issue, holding that the Policy is "clear and unambiguous" and that "a jury could find that coverage applied under the civil or military intervention provision." The trial court granted summary judgment on the second issue, holding that "it is clear from the express terms of the Policy that the parties did not intend to provide coverage for loss of market share." The trial court denied summary judgment on the third issue, holding that US Airways complied with the proof of loss requirements of the policy. Finally, the trial court granted summary judgment on the fourth issue, holding that US Airways' claim based upon an "implied covenant of good faith and fair dealing" was premature. The trial court dismissed this claim without prejudice.

According to the trial court, US Airways' motion for partial summary judgment presented one issue: whether proceeds received under the Air Transportation Safety and System Stabilization Act ("Stabilization Act"), Pub. L. No. 107-42, 115 Stat. 230 (2001), should "offset any compensation received under the Policy with PMA." Section 24 of the Policy, entitled "Salvage and Recoveries," states in relevant part that "[a]ll salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this policy shall

4

reduce the loss accordingly."  US Airways argued that Congress did not intend for the Stabilization Act to reduce insurance proceeds.  PMA argued that the plain language of the Policy should resolve the controversy.

Because "payment" is not defined in the Policy, the trial court used the definition given in Black's Law Dictionary: "[t]he fulfillment of a promise, or the performance of an agreement."  Black's Law Dictionary 1129 (6th ed. 1990).  The trial court, rejecting PMA's argument, concluded that under this definition, "it would appear that 'payments' [as used in Section 24 of the Policy] do not contemplate proceeds from federal programs."  The trial court did not define or consider the words "salvages" or "recoveries" in its letter opinion and order.  Utilizing language from the Federal Register, the trial court relied upon commentary by the Department of Transportation interpreting the Stabilization Act to surmise "Congressional intent" and concluded:

> Based upon the procedures set forth by the federal government, US Airways must offset any insurance proceeds from any claim under the Stabilization Act, but that does not require US Airways to offset the federal payment from its claim for coverage under the . . . Policy.

The trial court granted US Airways' motion for partial summary judgment.

5

A bench trial followed and the trial court bifurcated the proceeding into an initial phase to determine if coverage existed under the terms of the Policy and, if necessary, a second phase to determine damages. In the initial phase, the trial court held that "US Airways' claim for business interruption is covered by the Policy and that US Airways has satisfied all of the necessary conditions precedent to move for recovery." In the interest of judicial economy, and in their own desire "to minimize the further expenditure of money on litigation costs and attorneys' fees," PMA and US Airways then stipulated to the amount US Airways would be able to recover from PMA in the event this appeal by PMA proved unsuccessful. In relevant part, the parties agreed that US Airways' recovery under the Policy would be $2.1 million, that each would pay its own "litigation costs and attorneys' fees, whether incurred before or after the date of this Stipulation," and that the stipulation agreement would "remain in effect unless and until the Supreme Court of Virginia reverses the [trial court's] finding of coverage or remands the case for further proceedings."

PMA filed a timely petition for appeal, which we granted and limited to nine assignments of error. However, our resolution of this appeal requires us to consider only one:

It was error for the trial court to find that any payments received by US Airways from the federal government pursuant to the Stabilization Act were not recoveries under the [Policy's] set-off provision.

## II.  Analysis

The standard of review we must employ is familiar and well-settled.  The interpretation of a contract presents a question of law subject to de novo review.  Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C., 269 Va. 315, 324, 609 S.E.2d 49, 53 (2005).  "We review questions of law de novo, including those situations where there is a mixed question of law and fact."  Westgate at Williamsburg Condo. Ass'n v. Philip Richardson Co., 270 Va. 566, 574, 621 S.E.2d 114, 118 (2005).  See also Barter Found., Inc. v. Widener, 267 Va. 80, 90, 592 S.E.2d 56, 61 (2004) (We review the trial court's "application of the law de novo, while giving deference to [its] factual findings.").  "[W]e have an equal opportunity to consider the words of the contract within the four corners of the instrument itself."  Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 631, 561 S.E.2d 663, 667 (2002) (citing Wilson v. Holyfield, 227 Va. 184, 187-88, 313 S.E.2d 396, 398 (1984)).

The contract is construed as written, without adding terms that were not included by the parties.  Wilson, 227 Va. at 187, 313 S.E.2d at 398.  When the terms in a contract are

7

clear and unambiguous, the contract is construed according to its plain meaning. Bridgestone/Firestone Inc. v. Prince William Square Assocs., 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995). "Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." D.C. McClain, Inc. v. Arlington County, 249 Va. 131, 135-36, 452 S.E.2d 659, 662 (1995); see also Scottsdale Ins. Co. v. Glick, 240 Va. 283, 288, 397 S.E.2d 105, 108 (1990); American Health Ins. Corp. v. Newcomb, 197 Va. 836, 842-43, 91 S.E.2d 447, 451 (1956); Ames v. American National Bank, 163 Va. 1, 38-39, 176 S.E. 204, 216-17 (1934).

After a thorough review of the Policy, we will assume, without deciding, that the trial court did not err in its conclusion that "US Airways' claim for business interruption is covered by the Policy and that US Airways has satisfied all of the necessary conditions precedent to move for recovery." We conclude that it is unnecessary to decide the coverage issue on appeal because even if coverage applies, the provisions of Section 24 of the Policy resolve this appeal.

PMA argues that the trial court erred in its judgment that the payments received by US Airways from the federal

government pursuant to the Stabilization Act were not required to reduce losses claimed under the Policy.  We agree with PMA. In its claim under the Policy, US Airways stated losses of approximately $58 million.  The Policy limits were $25 million and, as a participating insurer, PMA's maximum liability exposure was $2.5 million.  Pursuant to the Stabilization Act, US Airways received approximately $310 million from the federal government.

Section 24 of the Policy required that losses claimed under the Policy be reduced by "[a]ll salvages, recoveries, and payments, . . . received prior to a loss settlement . . . ."  Section 101 of the Stabilization Act, entitled "Aviation Disaster Relief," is the portion of the Act applicable to this appeal.  In relevant part, it states:

> (a)  In General.– Notwithstanding any other provision of law, the President shall take the following actions to compensate air carriers for losses incurred by the air carriers as a result of the terrorist attacks on the United States that occurred on September 11, 2001:
>
> . . . .
>
> (2)  Compensate air carriers in an aggregate amount equal to $5,000,000,000 for –
> (A)  direct losses incurred beginning on September 11, 2001, by air carriers as a result of any Federal ground stop order issued by the Secretary of Transportation or any subsequent order which continues or renews such a stoppage; and
> (B)  the incremental losses incurred beginning September 11, 2001, and ending

December 31, 2001, by air carriers as a
direct result of such attacks.

Pub. L. No. 107-42, § 101(a), 115 Stat. 230, 230 (2001). By its plain language, the Stabilization Act was designed to "compensate air carriers" like US Airways for both "direct losses" as a result of "any Federal ground stop order" and "incremental losses" as a "direct result of" the September 11, 2001, terrorist attacks.

Pursuant to the Stabilization Act, the Department of Transportation promulgated rules governing how air carriers would receive federal compensation. See 14 C.F.R. §§ 330.1 – 330.45 (2005). The Office of the Secretary for the Department of Transportation ("DOT") commented on these rules prior to their final publication. See Procedures for Compensation of Air Carriers, 67 Fed. Reg. 54,058 (Aug. 20, 2002). The trial court relied on these comments in reaching its judgment and US Airways argues that these comments demonstrate that the Congress of the United States did not intend for the Stabilization Act to constitute a salvage, payment, or recovery for purposes of Section 24 of the Policy.

In commenting on the Stabilization Act, the DOT declared that President Bush and the Congress acted "rapidly to preserve the continued viability of the U.S. air transportation system." Id. at 54,058. The DOT, in

interpreting Section 101 of the Stabilization Act, stated, "Congress intended the Act to compensate carriers for those permanent, un-recovered economic losses that the carrier actually experienced or became liable for during the entire applicable time period." Id. at 54,062. The DOT concluded that the "purpose of the payments was to mitigate or prevent losses as a way of preventing bankruptcies, massive service disruptions and additional layoffs." Id. at 54,063.

When viewed together, the plain language of both Section 24 of the Policy and Section 101 of the Stabilization Act clearly indicate that the proceeds received by US Airways from the federal government do constitute "salvages, recoveries, and payments" and that the trial court erred in concluding otherwise. The Policy did not define the words "salvages, recoveries, and payments." Of the three qualifying categories, the trial court only considered the term "payments" and held that the proceeds received by US Airways under the Stabilization Act were not "payments" as contemplated by the Policy and did not have to be deducted from any claims under the Policy. Assuming without deciding that the trial court did not err in its definition of "payments," the trial court did err by not considering the term "recoveries." "Recovery" is defined as "the regaining or restoration of something lost or taken away," Black's Law

11

_Dictionary_ 1302 (8th ed. 2004), and "the act of regaining or returning toward a normal or usual state."  _Webster's Third New International Dictionary_ 1898 (1993).

Section 101 of the Stabilization Act clearly states that its purpose is "to compensate air carriers for [direct and incremental] losses incurred by the air carriers as a result of the terrorist attacks on the United States that occurred on September 11, 2001."  Pub. L. No. 107-42, § 101(a), 115 Stat. 230, 230 (2001).  The comments published in the Federal Register by the Department of Transportation as part of the rules it promulgated pursuant to the Stabilization Act reaffirm this purpose.  Stated differently, the federal compensation provided by Stabilization Act was for the purpose of regaining or restoring the losses suffered by US Airways as a result of the terrorist attack of September 11, 2001.  Thus, the Stabilization Act funds received by US Airways are a form of "recoveries" under Section 24 of the Policy.

In ruling that US Airways was not required by Section 24 of the Policy to reduce its claim for business interruption losses by the amount of the funds received from the federal government under the Stabilization Act, the trial court essentially re-wrote the Policy and made a new contract between PMA and US Airways.  It was error to do so.  _See Westgate_, 270 Va. at 574, 621 S.E.2d at 118; _Lansdowne Dev._

12

Co., L.L.C. v. Xerox Realty Corp., 257 Va. 392, 400-01, 514 S.E.2d 157, 161 (1999).

## IV. Conclusion

Assuming without deciding that US Airways was covered by the Policy for the business interruption losses suffered as a result of the FAA order and the MWAA order, Section 24 of the Policy clearly requires the proceeds received by US Airways pursuant to the Stabilization Act to reduce US Airways' claimed losses against PMA under the Policy.  The $310 million received far exceeds the $58 million in claimed losses and far exceeds the $2.5 million potential liability of PMA under the Policy.  US Airways conceded during oral argument that if Section 24 of the Policy barred its recovery then remand would be unnecessary.  Accordingly, we will reverse the judgment of the trial court and we will enter final judgment in favor of PMA.

<u>Reversed and final judgment</u>.