COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Felton, Judges Benton and Petty
Argued at Richmond, Virginia


CHERYL A. CONCANNON

MEMORANDUM OPINION[*] BY
v.      Record No. 2108-06-2      JUDGE JAMES W. BENTON, JR.
                                  MAY 8, 2007
WILLIAM GLADSTONE


FROM THE CIRCUIT COURT OF ORANGE COUNTY
Franklin R. Blatt, Judge *Pro Tempore*

Benjamin M. Smith, III (The Duff Law Firm, on briefs), for
appellant.

John H. Kitzmann (Davidson & Kitzmann, PLC, on brief), for
appellee.


This appeal concerns the enforcement of a property settlement agreement (the "Agreement")

that was incorporated by reference into a final decree of divorce. Cheryl Concannon presents

twelve questions alleging errors by the judge *pro tempore* in enforcing her Agreement with William

Gladstone. For the reasons stated below, we reverse the judgment, in part, and remand.

I.

The parties married February 26, 1996, and separated in May 2002. In an afternoon

recess during the divorce litigation, the parties and their attorneys negotiated an Agreement to

settle all contested issues. The hand-written Agreement, which the parties signed, was dated July

21, 2004, and provided in pertinent part as follows:

> 2. [Gladstone] shall receive from [Concannon] the sum of
> $314,000.00 in full settlement of any claim to the proceeds of sale
> from the parties' former property in Orange County, Va. known as

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"Belvedere" as well as in full settlement of any claims to any of the furniture or furnishings . . . . [Gladstone] waives any and all further claims against [Concannon] in connection with the parties' former interest in Belvedere; [Concannon] waives any and all claims of whatsoever nature against [Gladstone] in connection with the parties' former interest in Belvedere. These waivers are contingent on the payment by [Concannon] to [Gladstone] as specified aforesaid.

3. [Gladstone] shall assist [Concannon] to raise the amount of $314,000.00 for payment to him by doing the following:

a. by guaranteeing a loan to be obtained by [Concannon] against that certain piece of property currently owned by her and/or owned by a trust of which she is the sole beneficiary located in . . . Idaho . . . . [Concannon] represents that the record owner of the . . . property is . . . a limited liability company . . . of which [Concannon] is the sole member . . . and that she will take no steps such as conveying or retitling the property which would hinder or defeat her ability to so encumber the property. The loan to be guaranteed by [Gladstone] shall be $450,000.00. [Gladstone] and [Concannon] will take all steps to secure the financing as specified herein and using the Idaho property as security therefore, including cooperating with [Gladstone] to secure the financing as expeditiously as possible. The Circuit Court of Orange County, Va. will retain jurisdiction over this matter to enforce and supervise the refinance process to assure prompt placement of the financing on the property . . . .

\* \* \* \* \* \* \*

4. In exchange for [Gladstone]'s undertaking [Concannon] agrees to the following:

a. pay [Gladstone] the sum of $314,000.00 in settlement of his claims as aforesaid by securing the loan against the aforesaid Idaho property as expeditiously as possible. Further she will take no action to prevent the placement of the loan as specified herein. And, for as long as [Gladstone] remains guarantor of the aforesaid loan, she will place no other encumbrances nor voluntarily allow any to be placed by anyone else against the property;

\*　　\*　　\*　　\*　　\*　　\*　　\*

5.  That . . . Gladstone shall cause Waterside Productions, Inc. to enter into an employment agreement with . . . Concannon including the following terms:

> a.  a 5 year term beginning on the date this agreement is signed.
>
> b.  a monthly rate of $3,000.
>
> c.  payment of . . . Concannon's premium on her current health insurance policy or a same or equivalent policy.
>
> Ms. Concannon's employment agreement under this section shall not be terminated for any reason.

6.  If at any time . . . Concannon's employment agreement is terminated, . . . Gladstone shall pay to . . . Concannon as spousal support an amount of $3,000 per month for spousal support for a number of months equal to the number of months left in the aforesaid employment agreement.  Such support shall not be modifiable or terminat[ed] for any reason whatsoever . . . .

\*　　\*　　\*　　\*　　\*　　\*　　\*

In the event [Concannon] fails to obtain the financing against the Idaho property as contemplated by this agreement the parties agree to the following:

> a.  If [Concannon] fails, within 90 days from the execution of this agreement to obtain said loan, then, commencing with the fourth payment due to her from Waterside[, Gladstone] shall be paid by [Concannon] the sum of $1500 per month in partial payment of the amount she owns [Gladstone] under this agreement.  [Gladstone] shall be entitled to withhold this amount ($1500) each and every month from her Waterside salary . . . and he shall apply said amount against the total sum [Concannon] owes. At the end of [Concannon]'s guaranteed employment with Waterside . . . [Concannon] shall owe him the difference between the amount owed and the total he has been paid against that sum from her salary . . . .
>
> b.  In lieu of [Concannon] paying [Gladstone] $314,000.00 for which she owes him if the loan is secured, [Concannon]'s obligation to [Gladstone] will be $350,000.00 and the monthly amounts withheld from her

> salary . . . shall be credited against a total amount due [Gladstone] of $350,000.00;
>
> c. [Concannon] shall be obligated to sell or place financing against the aforesaid Idaho property to pay the sum due him on or before the date upon which Waterside is obligated to employ her (i.e. 60 months) . . . .  To that end, [Concannon] shall either obtain the financing within said period, or cause the property to be listed for sale with a mutually agreeable realtor who shall set the asking price . . . by the first day of the fifty-ninth month after execution of this Agreement.

The Agreement was signed by Gladstone, Gladstone for Waterside Productions, Concannon, and Concannon for her limited liability corporation and trust.  The divorce decree, which was entered October 19, 2004, "ratifi[ed], confirm[ed], approve[d], and incorporate[d], but [did] not merge [the Agreement] into [the] decree by reference."

After entry of the decree, Gladstone made monthly payments to Concannon in accordance with the Agreement.  For the first three months, he paid $3,000 each month; he then reduced his payments to $1,500 a month.  A year after entry of the divorce decree, the judge *pro tempore* entered an order finding that the Agreement "ha[d] not been fully implemented" and setting a hearing concerning "implementation" of the Agreement.  Prior to the hearing, Gladstone filed a motion alleging Concannon had transferred her ownership of the Idaho property.  He asked the judge to hold her in contempt, to appoint a special commissioner to obtain a loan or sell the Idaho property, to award him judgment for $357,000 against Concannon, and to grant other relief.

At the evidentiary hearing, Gladstone testified that he had done everything in his power to help Concannon obtain the best possible loan.  Gladstone testified he contacted a California lender, but later was told this lender believed it "had to have a presence in Idaho . . . to issue a loan."  After Gladstone learned this and talked to Concannon, she selected an Idaho bank.  Gladstone testified he sent the necessary paperwork to the Idaho bank as her guarantor, but the

Idaho bank did not respond for six weeks and then denied the loan for insufficient income. When this occurred, Gladstone contacted Dominic Scibilia, a mortgage broker, about obtaining a loan for Concannon and then informed Concannon she "can get a loan, there's a no-doc loan, there's a variety of loans [she] can get." He testified Concannon responded that "90 days is up, I have no obligation to do anything."

Scibilia testified he first spoke with Concannon in July or August of 2004, but acknowledged it was possible he first spoke to her in October 2004. Indeed, an exhibit, a copy of an e-mail message from Gladstone to Concannon dated October 1, 2004, informed Concannon that she would soon be receiving a call from Scibilia about a potential loan and asked if she would cooperate with him. A week later in another e-mail message, Gladstone indicated Scibilia thought he could get a loan for Concannon if she "added Gladstone to the title of the property." In Scibilia's initial conversation with Concannon, he indicated that Gladstone's guarantee of the loan "required certain things, putting people in certain places on the title and things like that." He said "Concannon was adamant against that."

Scibilia testified Concannon could have obtained a loan for $400,000 in August 2004 and that at the time of his testimony a loan was available to her for that amount. He testified, however, "the lender will only lend to a person" and, therefore, Concannon would need to title the property in her name. Scibilia explained that, although the contract required a loan of $450,000, Gladstone had indicated to him a loan of $400,000 would suffice. Scibilia testified a loan for the higher amount also could be had and he knew of "a number of loans available that given certain credit and financial status do not require a lot of documentation." He said, at the time of the hearing, he had "made a formal submission to a lender . . . and [was] waiting for physical underwriting approval" for a $400,000 loan.

Scibilia acknowledged that if the lender determined Concannon lacked the ability to repay the loan, it might be necessary to put Gladstone on the title to the Idaho property. Scibilia testified the monthly payments for the $400,000 loan he could obtain were estimated to be $3,712.87, but he said he did not recall the amount Gladstone was paying Concannon each month. Scibilia testified he "was able to gather from a credit reporting service, [Concannon] does qualify based on her credit worthiness." Although Scibilia did not know Concannon's income, he informed lenders her income was "$9800 a month" because he "estimated . . . that is a reasonable income for someone in her profession." Scibilia acknowledged, however, that neither Gladstone nor Concannon had filled out an application with him and Gladstone had not sent his tax return.

Scibilia testified Concannon has to certify she has the assets and income to repay the loan. If she did not "have the assets to pay this loan, then that's something . . . the parties need to figure out among themselves." He testified Concannon would not qualify for the loan if her monthly income was $1,500 or $3,000; however, he testified that "with cooperation on her part, this is an opportunity for a significant savings in interest rate." He also testified if Gladstone guaranteed the loan, "he has to go on [the] title" to the property. Scibilia testified that if Concannon signed the loan with his "assumed numbers," she would get the loan because "the numbers are not checked; its just verified as her place of employment." According to Scibilia, Concannon's signature would be "a certification it's correct."

The escrow manager of a title company testified the Idaho property was titled in the name of Concannon's limited liability corporation, which was represented in the Agreement. The escrow manager testified, however, that to close a loan to Concannon the limited liability corporation would have to be "out of title."

Concannon testified that she submitted applications to three different lenders within the ninety-day period following the Agreement. She said her intent was to obtain the financing expeditiously and within the limited time period. She testified she believed Gladstone had obtained a commitment for financing from his bank when they signed the Agreement in July 2004, but she never received an application from that bank. According to Concannon, the first lender Gladstone contacted was a sub-prime vendor. After two months had lapsed, the California lender informed her it was not licensed to make loans in Idaho and also raised as an issue her employment status.

Concannon testified she applied for a loan with a local Idaho bank and gave that bank information about Gladstone. When the bank asked for her income, she supplied the bank a copy of the Agreement and disclosed her other income of $200 per month from royalties. She testified the Idaho bank sent Gladstone an application for him to be co-borrower and later rejected the loan application after receiving the information. She testified the bank had conversations with Gladstone during the application process that concerned them. Concannon said the discussion concerned her employment status and whether she was an employee or independent contractor. She testified the main issue with respect to the loan was her salary.

Concannon also testified that Scibilia first contacted her in October 2004, that Scibilia told her he would be unable to obtain a loan unless she put Gladstone on the title to the property, and that Scibilia did not ask about her income. She testified she did not change the title on the Idaho property, which remained titled to the limited liability corporation.

Five months after the hearing, the judge entered a decree on May 25, 2006, appointing a special commissioner to obtain a loan "in the name of Concannon" and "in an amount sufficient to pay . . . Gladstone $314,000" and to pay other costs. The decree also adjudged that "the Agreement constitutes an employment agreement . . . and . . . Concannon is an employee of

- 7 -

Waterside Productions, Inc.," and the decree provided other rulings to implement the Agreement. Following the filing of motions and further argument, the judge entered a further order on July 21, 2006, implementing the May 25 decree and ordering various payments under the employment aspect of the Agreement.

II.

Concannon appeals the May 25, 2006 decree and the July 21, 2006 order, primarily arguing the terms of the Agreement specified alternative contractual obligations if she failed to obtain a loan within ninety days. Concannon contends the appointment of the special commissioner deviated from the parties' Agreement because the Agreement already provided "an extensive contingency plan" if she did not obtain the loan. That is, if she did not obtain a loan within ninety days of the Agreement, Gladstone's company would pay her the reduced monthly amount of $1,500 for the remaining five years, after which she would pay him $350,000, less the monthly salary he withheld under the Agreement. Concannon reasons, that because the evidence demonstrated her efforts to obtain the loan failed, the "contingency" provisions in the Agreement should have taken effect, and she argues the "contingency provisions of the agreement [were] not conditioned upon the 'level of effort exerted'" by her. Concannon additionally contends that the trial judge erred by sanctioning her for not obtaining a loan within ninety days, in ruling that the parties' Agreement did not imply a reasonable interest rate for the loan, by interpreting the Agreement to give her a "reasonable time" to obtain the loan, in finding that a suitable loan product was available to her, in refusing to allow her to present additional evidence on her efforts to obtain the loan, in structuring the employment payment obligation differently than contemplated by the Agreement, and by not requiring Gladstone to pay her the full amount of the employment arrearage.

Gladstone responds that the trial judge did not err by appointing the special commissioner to obtain the loan for Concannon, because in doing so he simply enforced the parties' Agreement. He argues the "contingency plan will only go into effect if . . . Concannon first exerted the level of effort contemplated by the Agreement." He further contends the trial judge did not sanction Concannon for her failure to obtain a loan, and the judge properly ruled on all other issues.

III.

Marital property settlement agreements are "contracts subject to the same rules of formation, validity, and interpretation as other contracts." Bergman v. Bergman, 25 Va. App. 204, 211, 487 S.E.2d 264, 267 (1997). As with contracts, interpretation questions concerning property settlement agreements are subject to *de novo* review on appeal. Id.; PMA Capital Ins. Co. v. US Airways, Inc., 271 Va. 352, 357-58, 626 S.E.2d 369, 372 (2006). Thus, "if all the evidence which is necessary to construe a contract was presented to the trial court and is before the reviewing court, the meaning and effect of the contract is a question of law which can readily be ascertained by this court." Fry v. Schwarting, 4 Va. App. 173, 180, 355 S.E.2d 342, 346 (1987).

The Agreement explicitly provided that, "[i]n the event [Concannon] fails to obtain the financing against the Idaho property as contemplated by this agreement," other provisions in the Agreement would apply. Both parties address the failure to obtain the financing within ninety days as a "contingency." See Black's Law Dictionary 338 (8th ed. 2004) (denoting a contingency as an event that may or may not occur, an event that is a possibility). In essence, Concannon says the Agreement contains a "contingency plan." On the other hand, Gladstone approaches Concannon's failure to obtain the financing as a breach of the Agreement. The Agreement, however, does not structure this event as a breach of the Agreement or an event in

default of the provisions of the Agreement. Rather, by the Agreement's express terms, it is an event that triggers an alternative means of satisfying the contractual obligation. The parties agreed to a specific action to be taken by Concannon with Gladstone's assistance, and they agreed that if Concannon "fails to obtain the financing" within ninety days, then they would embark upon a different course of action. In other words, the occurrence of either of the agreed events (Concannon's success or failure in obtaining financing) would trigger a means of fully performing the obligations. Concannon's failure to obtain financing was not an unanticipated or unforeseen event because, by their own agreement, they contemplated the happening of this "contingency," as they label it, and provided an alternative means of satisfying their mutual obligations. See generally D&N Boening, Inc. v. Kirsch Beverages, Inc., 99 A.D. 522, 523 (N.Y. App. 1984) (discussing in another context contracts containing "an express contingency creating an alternative mode of performance").

The parties dispute the extent to which the Agreement denotes the necessary effort on the part of Concannon to obtain the financing. The Agreement's use of the term "fails" is instructive. When the meanings of a contract's terms are unambiguous, those terms must be construed as written. Campbell v. Campbell, 32 Va. App. 351, 355, 528 S.E.2d 145, 147 (2000). In this context, "fails" means "[t]o be deficient or unsuccessful; to fall short." Black's Law Dictionary 631 (8th ed. 2004). Among the dictionary definitions for "to fail" are: "to miss attainment," "to miss success in some effort," and "to neglect to do something." Webster's Third New Int'l Dictionary 814-15 (1981). The word "fails" is not qualified or otherwise explained in the Agreement.

At the hearing in July 2006, the trial judge found "that it came out in the evidence . . . there was only one attempt made by . . . Concannon to obtain a loan." Thus, he found that "Concannon has not attempted in good faith to get a loan." The evidence proved, however, that

- 10 -

Gladstone, who also agreed to "take all steps to secure the financing," initially contacted a lender in California to assist Concannon in obtaining financing. Although Concannon testified the lender informed her two months later that it could not make such a loan in Idaho, Gladstone said he told Concannon that fact within hours of his learning the information. The trial judge did not make findings specific to this issue but generally found "Concannon less credible than . . . Gladstone."[1] Both Gladstone and Concannon testified, however, that when this lender indicated he could not provide financing, Concannon applied for a loan with an Idaho bank. Gladstone testified the application remained with the bank for more than six weeks awaiting a decision. After the bank rejected the loan, according to Concannon because of her salary, Gladstone contacted Scibilia in October of 2004.

Scibilia sought to have Concannon apply for a loan in an amount different than required by the Agreement; he wanted Concannon to add Gladstone's name to the title to the property; and he gave false information to a lender regarding Concannon's income. The judge "discounted the testimony of [Scibilia] and . . . found it somewhat abhorrent that his explanation as to plugging a salary figure in for [Concannon] was okay because the banks didn't check on that."

Even discounting Concannon's testimony that she applied for two additional loans, the evidence proved Concannon relied unsuccessfully upon Gladstone's California lender; she made an application to an Idaho bank which was rejected in September or October; and then she had dealings with Scibilia in October upon Gladstone's suggestion. In view of the judge's finding that Scibilia's conduct was "shocking," Concannon's refusal to cooperate with his scheme cannot be deemed a failure to act in good faith.

---

[1] The trial judge later rejected Concannon's effort to supplement the evidence with a letter from the lender that supported Concannon's recollection of the time lag. The letter was proffered as rejected evidence.

In short, Concannon twice relied upon Gladstone's recommendations as to sources of financing to no avail and was unsuccessful in obtaining a loan on her own initiative from an Idaho bank. The Agreement did not require her to continue to apply for a loan after receiving a rejection based on insufficient income. No evidence established that she acted in bad faith when she applied to the Idaho bank, or that the loan was rejected because she was not acting in good faith. She and Gladstone completed the application and were rejected.[2]

Regardless of Concannon's level of exertion expended to obtain the financing, she was unsuccessful in obtaining it. "The fact that the parties attribute to the same terms variant meanings does not necessarily imply the existence of ambiguity where there otherwise is none." Smith v. Smith, 3 Va. App. 510, 513-14, 351 S.E.2d 593, 595 (1986). The Agreement provided an alternative means of proceeding if Concannon failed to obtain the financing, and both of the parties are bound by those terms. When the ninety-day period expired, so did Concannon's obligation to obtain the loan. This is the bargain they agreed upon. "However inartfully it may have been drawn, the court cannot make a new contract for the parties, but must construe its language as written." Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983).

The evidence proved the joint efforts of the parties failed to secure the desired financing. In addition, the evidence proved that when Concannon failed to obtain the financing within the ninety-day period, Gladstone reduced his monthly payments to Concannon from $3,000 to $1,500, which was consistent with the terms of the Agreement. Notwithstanding these events, the judge ruled as if these events were irrelevant. We hold the trial judge erred by ordering

---

[2] Evidence in the record indicated that the monthly payment for a $400,000 loan Scibilia had sought was $3,712.87 and further indicated Concannon's monthly income consisted of the $3,000 payments she expected from Gladstone and royalties of $200. Indeed, the evidence supports the inference that Scibilia used a false, inflated figure for Concannon's income when seeking a loan because he knew her salary of $3,000 was not sufficient to qualify her for a $400,000 loan. He also testified her income would not support a loan for $450,000, which was the amount of financing required by the Agreement.

action contrary to the parties' Agreement. Code § 20-109(C) inhibits the judge's power to contravene "the plain language of the Agreement." Owney v. Owney, 8 Va. App. 255, 260, 379 S.E.2d 745, 748 (1989). The Agreement required Gladstone to pay Concannon the reduced monthly salary of $1,500 for the duration of her employment contract and, at the end of that period, for Concannon to pay Gladstone the difference between the $350,000 owed and the total he withheld from her salary. Simply put, the trial judge erred in ruling the agreement did not contemplate the events that occurred and erred in appointing a special commissioner to seek financing for Concannon. We, therefore, reverse and remand on this issue.

IV.

Concannon additionally contends the trial judge erred by not awarding her the entire arrearage owed under the employment arrangement and interest on the arrearage for the months from November 1, 2004 through September 1, 2006. Gladstone contends the trial judge acted within his discretion in not requiring Gladstone to pay the arrearage because, he argues, the evidence supported the judge's ruling that "nobody can agree on what the employment arrangement is."

The Agreement provided for Gladstone to pay Concannon a salary of $3,000 a month beginning August 2004. After three months, Gladstone was to reduce the monthly payments to $1,500 due to Concannon's failure to obtain financing. Although Gladstone wrote Concannon checks for the appropriate amounts, Concannon did not cash them because she believed the Agreement made her an employee and she objected to Gladstone's inscription on the checks of "independent contractor." The trial judge ordered Gladstone to re-issue payment for August, September, and October of 2004, and for September of 2006 and the following months. Without explanation, the trial judge did not order Gladstone to re-issue payment for all of the money due to Concannon under the Agreement, specifically for the months November 2004 until September

- 13 -

2006. We agree with Concannon that the judge's failure to order payments for this gap was error.

Concannon further argues that the trial judge abused his discretion by not awarding interest on the arrearages. Code § 8.01-382 provides, in pertinent part, "In any action at law or suit in equity, the verdict of the jury, or if no jury the judgment or decree of the court, may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Under the statute, whether to award prejudgment interest rested within the trial judge's discretion. Grubb v. Grubb, 272 Va. 45, 57, 630 S.E.2d 746, 753 (2006). Although Concannon had not collected the money due to her under the contract, Gladstone wrote her checks for the correct amounts. We hold that under these circumstances, the trial judge did not abuse his discretion by declining to award prejudgment interest on the principal sum.

V.

For these reasons, we hold the trial judge erred by appointing a special commissioner to seek financing, and we reverse and remand to the trial judge for entry of an order requiring the parties to enforce the obligations provided in the Agreement. Because we hold that Concannon's failure to obtain a loan within the ninety days was contemplated by the Agreement and that she was no longer obligated to obtain a loan under those provisions, we do not address the other questions presented pertaining to the loan and the appointment of a special commissioner to obtain the loan. We further hold that the trial judge erred by not issuing a judgment on the full sum due to Concannon under the Agreement's employment obligations, but did not err by declining to award interest on the sum.

Affirmed in part, reversed in part, and remanded.