# CIRCUIT COURT OF FAIRFAX COUNTY

Irving Greenspon

v.

Allan Hurwitz

October 24, 2014

Case No. CL-2014-1584

By Judge Bruce D. White

This matter came before the Court on September 26, 2014, for argument on Defendant Hurwitz's Motion for Summary Judgment. At the conclusion of the hearing, the Court took the matter under advisement. The Court is confronted with a single issue in deciding the motion: pursuant to AHT Associates, L.L.C.'s ("AHT") Operating Agreement, should AHT utilize the Capital Account Method or the Net Investment Method in distributing a settlement from Madoff Securities to AHT's Members. The parties agree that the matter is appropriate for Summary Judgment on the record before the Court at this time.

## Background

AHT was formed solely to invest in Bernard L. Madoff Investment Securities, L.L.C., ("Madoff Securities") which sold marketable securities. The relationship between and among AHT's members was and is governed by an Operating Agreement ("OA") dated January 1, 1998. To become a member of AHT required an initial "Capital Contribution." Once a member, AHT maintained a capital account for each member. Irving Greenspon and Allan Hurwitz are the two remaining Managing Members of AHT. Pursuant to the OA, AHT originally had three Managing Members, however, the third Managing Member is now deceased and has not been replaced.

The OA set forth provisions as to how the capital accounts of each member are to be maintained (*infra* OA ¶ 7), how profits and losses shall be allocated

to members (*infra* OA ¶ 9(a)), and how the dissolution of the business shall be wound up (*infra* OA ¶ 19). Since the inception of AHT, AHT invested 100% of its assets with Madoff Securities. AHT distributed profits to its members throughout its existence pursuant to the terms of the OA.

On December 11, 2008, Madoff Securities was revealed to be a Ponzi scheme. Since that time, AHT has been in the process of dissolving and winding up its affairs because its sole purpose can no longer be fulfilled. As a part of the winding up process, AHT entered into a settlement agreement with the Madoff Securities' Trustee. The Managing Members charged with distributing this settlement to AHT's members contemplated two potential methods of distribution. How AHT categorizes the distribution will affect the amount of the distribution of the settlement to each member of AHT.

The two potential methods of distribution are the Net Investment Method (also referred to in the Complaint as the straight netting method) and the Capital Account Method. The Net Investment Method disregards all past, arguably fictitious, profits received over the years and recharacterizes money received from the settlement as a return of the member's original investment. The member's original investment would be determined by subtracting each member's prior distribution from his or her capital investment. The Capital Account Method recognizes all profits gained by AHT prior to the discovery of the Ponzi Scheme in 2008, and any losses suffered by AHT would be treated like any other investment loss. A distribution by this method would look to each member's capital account and would deduct net losses (and add net gains) from a capital account in proportion to the member's contribution. It is important to note that a distribution using the Net Investment method would tend to benefit the later investors who did not receive fictitious profits over earlier investors. A distribution using the Capital Account method would tend to benefit earlier investors who received these fictitious profits over later investors.

The Managing Members brought the issue of which method of distribution to use to a vote among the members of AHT because the selection of one methodology over another favors some members over others. A vote is allowable because the OA states that the Managing Members "shall consult with the other Members as they deem advisable." OA ¶ 10(f). Once an issue is brought to a vote, the OA does not require that the Managing Members take any specific actions regarding the results of the vote. Approximately 84% of the Members responded to the request for input. A majority of the members voted to use the Net Investment Method; however, the Managing Members did not believe there was a clear enough consensus to follow the majority's suggestion. Notably, an overwhelming majority of the members voted for the method that would yield a higher personal payment. Since the Managing Members were not persuaded by the vote and the two Managing Members, Plaintiff and Defendant, do not agree on which method to utilize, the Managing Members decided to

seek judicial guidance and, as such, initiated this declaratory judgment action. Both parties stipulate that summary judgment is appropriate in this matter.

After the filing of the motion for summary judgment, eight members of AHT filed a motion to intervene. The following members petitioned the Court to intervene:

(1) Selma Posner, a member who holds an IRA with Morgan Stanley Dean Witter. The IRA became a member of AHT in 1999;

(2) Marvin Posner Revocable Trust, with Marvin Posner as trustee. The trust was an original member of Fund in 1998;

(3) Marvin Posner, a member who holds an IRA with Morgan Stanley Dean Witter. The IRA became member of AHT in 1999;

(4) Robert and Beverly Sweeney, joint members of AHT since 1998;

(5) Irvin Posner, a member of AHT since 2006;

(6) Irving Posner, a member who holds an IRA with Morgan Stanley Dean Witter. The IRA became a member of AHT in 1999;

(7) Susan Becker, a member of AHT since 2003;

(8) Marlyn Zarin, a member of AHT since 2003.

On September 26, 2014, the morning of trial, the Court granted the recently filed motion to intervene but, pursuant to their counsel's request, limited the members' intervention solely for the purpose of arguing regarding which methodology AHT should utilize in distributing the Madoff Settlement to AHT's Members. On September 26, 2014, the Court heard oral argument on the motion for summary judgment and, thereafter, took the matter under advisement.

*Arguments*

A. *Defendant Hurwitz*

Defendant Hurwitz argues in his motion for summary judgment that the Capital Account Method is the appropriate methodology to use because it follows AHT's Operating Agreement. Defendant argues that the OA is a contract that binds the parties to this suit and the members. Hurwitz Memo in Support Mot. Summ. J. 8. The OA states the following:

> A separate capital account shall be maintained for each Member. Such account shall reflect, at any time (i) his cash contributions and his portion of the Net Profits of the Company, less (ii) all distributions made to him and his portion of the Net Losses of the Company. A Member's Capital Account shall also be adjusted for any adjustment required by Section 704(b) of the IRC of 1986 . . . and the regulations thereunder.

OA ¶ 7. Section 704(b) of the IRC states the following:

> A partner's distributive share of income, gain, loss, deduction, or credit . . . shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances), if:
>
> . (1) the partnership agreement does not provide as to the partner's distributive share of income, gain, loss, deduction, or credit . . . or
>
> (2) the allocation to a partner under the agreement of income, gain, loss, deduction, or credit . . . does not have substantial economic effect.

In this case, the partnership provides as to the partner's distributive share of profits and losses in ¶ 9(a) of the OA. Defendant does not contend that IRC § 704(b)(2) applies in this situation. However, Defendant argues that 26 C.F.R. § 1.165-8, which was promulgated under § 704(b) of the IRC, states the following:

> [a] loss arising from theft shall be treated . . . as sustained during the taxable year in which the taxpayer discovers the loss. Thus, a theft loss is not deductible . . . for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss.

Hurwitz Memo in Support Mot. Summ. J. 10. The OA further states:

> Subject to the provisions of Section 9(b), Net Profits and Net Losses for any period shall be allocated to the Members and credited or debited to their respective capital accounts in the proportion which (i) each Member's capital account as of the beginning of such period bore to (ii) the sum of the capital accounts of all the Members as of the beginning of such period.

OA ¶ 9(a). OA ¶ 9(b) states:

> Except as required by Section 704(c) of the Code or the regulations thereunder, the Company will allocate its tax items in the same percentages that its book items are allocated in accordance with this Section 9.

Finally, Defendant cites OA ¶ 19, which provides:

> Upon dissolution, the business of the Company shall be wound up by the Managing Members or by a representative designated by them . . . who shall take the following action:

(2) Credit or debit, as the case may be, each Member's capital account with his share of the Net Profits and Net Losses (determined in the manner set forth in Section 9(a)) realized in connection with the assets of the Company liquidated as provided in clause (1) above and since the end of the immediately preceding Fiscal Period and all distributions made to or withdrawals made by such Member since the end of the immediately preceding Fiscal Period; and

(3) *Distribute to each of the Members, after the adjustments to the Members' capital accounts as provided in clauses (1) and (2) above, the balance, if any, of the assets of the Company in that proportion which each Member's capital account bears to the sum of the capital accounts of all the Members (adjusted as provided above).*

(Emphasis added.)

The OA clearly states that each account must be adjusted pursuant to § 704(b) of the IRC. Hurwitz Memo in Support Mot. Summ. J. 10. The IRC has ruled previously that such losses resulting from theft, as described in that section, include "fictitious income" that the promoter of the scheme credited to the investor's account and on which the investor reported as income on his or her tax returns for the years prior to the discovery of the fraud. *See Beacon Assocs. Mgmt. Corp. v. Beacon Assocs., L.L.C., I,* 725 F. Supp. 2d 451, 462 (S.D. N.Y. 2010) (citing Revenue Ruling 2009-9, 2009 WL 678990). Defendant argues that, in *Beacon,* the court ruled on a similarly situated declaratory judgment case, where the operating agreement mandated the use of the "valuation method," which is essentially the capital account method as described in this matter. Hurwitz Memo in Support Mot. Summ. J. 10. The *Beacon* court treated the loss as a theft loss and stated that the loss was sustained in the year it was discovered, which was 2008. *Id.* at 10-11.

Because Beacon's Operating Agreement requires that capital accounts be maintained in accordance with Federal Treasury rules, and because the IRS has ruled [in Revenue Ruling 2009-9] that losses attributable to Ponzi schemes be reported in the year they are discovered, Beacon's Operating Agreement must be read as requiring that Madoff theft losses, including those losses owing to fictitious profits, be allocated among its members' capital account in proportion to their interest in Beacon as recorded in December 2008 when Madoff s fraud was discovered.

*See Beacon Assocs. Mgmt. Corp.,* 725 F. Supp. 2d. at 462-63.

The Net Investment Method is sometimes used by bankruptcy trustees in bankruptcy cases when dealing with persons directly involved in a Ponzi scheme. *Id.* at 12. This method is rationalized by bankruptcy courts because, as stated in *Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec.*, when a Ponzi scheme collapses and there are insufficient funds to repay investments, the victims of fraud should recover proportionally in accordance with their actual losses, not their fictitious profits. 499 B.R. 416, 419 (S.D. N.Y. 2013). The *Beacon* court deliberated whether they should utilize the Net Investment Method. Hurwitz Memo in Support Mot. Summ. J. 13. They concluded, however, that, while "it may well be true . . . that in Ponzi scheme cases, equity and practicality favor the Net Investment Method," they should not utilize this method because the entity itself was not a Ponzi scheme. *Id.*; *Beacon Assocs. Mgmt. Corp.*, 725 F. Supp. 2d. at 463-64. "The Court is not aware of any legal authority that would allow it to upset this contract between and among Beacon's members, and is unpersuaded that equity demands it." *Beacon Assocs. Mgmt. Corp.*, 725 F. Supp. 2d. at 464. Defendant argues that the Net Investment Method is inappropriate because AHT is not in bankruptcy and was not, itself, a Ponzi scheme. Hurwitz Memo in Support Mot. Summ. J. 11. The Defendant concludes that the Operating Agreement is clear, as it was in *Beacon*, and therefore the Capital Account Method should be utilized.

## B. *Plaintiff*

The Plaintiff argues that the Net Investment Method is the appropriate methodology to use to distribute the settlement proceeds because other courts, in dealing with similar situations, have utilized this method in distributing settlement proceeds and, also, because the members called for this methodology in their vote.

Pursuant to the December 15, 2008, order in *S.E.C. v. Bernard L. Madoff & Bernard L. Madoff Inv. Sec., L.L.C.*, No. 08-CV-10791 (S.D. N.Y. Dec. 15, 2008), the Madoff Trustee was charged with the process of liquidating Madoff Securities, which included determining the appropriate methodology for the liquidation process. Madoff Securities calculated the amounts due to their customers based on the Net Investment Method. *In re Bernard L. Madoff Inv. Sec. L.L.C.*, 654 F.3d 229, 233 (2d Cir. 2011). This involved a "simple calculation" of the amount of money the customer invested minus the amount of monies withdrawn. Resp. Mot. Summ. J. 5. Both the Bankruptcy Court and Court of Appeals rejected the "Last Statement Method," which Plaintiff contends is similar to the Capital Account Method, because this method would have permitted the profits of the Madoff scheme, as shown on the customer's latest account statement, to be the benchmark for determining equitable distributions. *Id.* Instead of this, the courts used the Net Investment Method, which allowed the court

to ignore the timing of the claims, which, therefore, disregarded any phony profits associated with the scheme, and simply called for each customer to share the losses equally. *Id.* at 8.

Additionally, Plaintiff argues that of AHT's members who voted, 68% voted to use the Net Investment Method. *Id.* at 6 (citing Exhibit H, Voting Share Comparison Dec. 2013 of AHT). The Plaintiff states that, in *Beacon Associates*, which is heavily relied upon by the Defendant, the court found it significant that an overwhelming majority of the Beacon Members preferred the Valuation Method (as calculated by the Capital Account Method) versus the Net Investment Method. *Id.* Plaintiff argues that *Beacon Associates* represents a departure from the vast majority of cases addressing how to compensate disparate victims from fraud losses. *Id.* at 7 (stating that the Madoff Victim Fund itself is utilizing the Net Investment distribution methodology) (citing Grant Christensen, "Allocating Loss in Securities Fraud: Time to Adopt a Uniform Rule for the Special Case of Ponzi Schemes," 3 *Wm. & Mary Bus. L. Rev.* 309, 324, and n. 73 (2012); Paul Sinclair & Brendan McPherson, "The Sad Tale of Multiple Overlapping Fraudulent Transfers: Part IV," *Am. Bankr. Inst. J.*, 70 (2010)). Also regarding *Beacon Associates*, Plaintiff argues that the *Beacon Associates* fund involved an investment fund that was not 100% invested in Madoff Securities, which is distinguishable from the present matter because some of Beacon Associates' profits were real profits. *Id.* at 7.

Finally, Plaintiff argues that the Net Investment Method would not contradict the IRS's treatment of the Madoff Victims. Resp. Mot. Summ. J. 8 (citing *In re Bernard L. Madoff Inv. Secs. L.L.C.*, 424 B.R. 122, 137 (Bankr. S.D. N.Y. 2010) (stating that the court cannot state that the IRS's treatment of Madoff claimants is similar to recognizing fictitious profits as real income because the IRS and SIPC are governed by different statutory schemes)). Overall, the Plaintiff argues that the Net Investment Method is the fairest approach because it allows all members share in the losses equally.

## C. *Intervening Members*

During oral argument, the intervening members argued that the Net Investment Method is the appropriate methodology to use to distribute the settlement proceeds.

## *Analysis*

Both parties stipulate that there are no material facts in dispute and summary judgment is appropriate in this matter. The Virginia Supreme Court deals with interpretation of Operating Agreements as they would other contracts. *See TM Delmarva Power v. NCP of Va.*, 263 Va. 116, 118, 557 S.E.2d 199 (2002) (applying breach of contract law to the parties'

operating agreement). "Interpretation of a contract is a question of law that is reviewed *de novo*. . . . When a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." *Palmer & Palmer Co. v. Waterfront Marine Constr., Inc.*, 276 Va. 285, 289, 662 S.E.2d 77 (2008) (*citing PMA Capital Ins. Co. v. U.S. Airways, Inc.*, 271 Va. 352, 357-58, 626 S.E.2d 369 (2006); *Winn v. Aleda Constr. Co.*, 227 Va. 304, 307, 315 S.E.2d 193 (1984)).

The Court is charged with determining how to distribute the proceeds from the Madoff settlement to AHT's members. The Court agrees with Defendant Hurwitz that the Capital Account Method is the appropriate methodology to use. The Court finds *Beacon Associates* to be persuasive in determining the appropriate methodology in this matter. 725 F. Supp. 2d. 451 (S.D. N.Y. 2010).

In *Beacon Associates*, the OA stated that "upon dissolution, Beacon's remaining assets are to be distributed to `members in accordance with positive capital account balances . . . for the Company's taxable year in which the dissolution occurs'." *Id.* at 460. Capital account balances were defined to be equal to the member's proportionate share of the net worth of Beacon, which included "all cash and cash equivalents . . . accrued interest and the market value of all securities and other assets of Beacon. *Id.* The *Beacon* court stated that the OA clearly required that each member's distribution equal their proportionate share of the net worth of Beacon. *Id.* The *Beacon* court looked to Beacon's offering memo to determine whether the OA required that each members' interest equal their capital account balance as stated on Beacon's books as of December 2008 or whether their books should be restated to eliminate fictitious profits. *Id.* Since the offering memo clearly stated that net worth was to be calculated on the last business day of each month in each year and that all values assigned are final, binding, and conclusive, the court concluded that it could not disturb each member's final capital account balance because the OA did not permit them to do so. *Id.*

Like *Beacon Associates*, AHT's OA also mandates the use of the Capital Account Method. As stated before, ¶ 19 of the OA requires that Managing Members, upon dissolution:

> shall . . . credit or debit . . . each member's capital account with his share of the net profits and net losses (. . . set forth in Section 9(a)) realized in connection with the assets of the Company liquidated as provided in clause (1) above and since the end of the immediately preceding Fiscal Period and all distributions made to or withdrawals made by such Member since the end of the immediately preceding Fiscal Period.

OA ¶ 19. Also stated before, ¶ 9(a) sets forth how AHT will handle allocations:

> Subject to the provisions of Section 9(b), Net Profits and Net Losses for any period shall be allocated to the Members and credited or debited to their respective capital accounts in the proportion which (i) each Member's capital account as of the beginning of such period bore to (ii) the sum of the capital accounts of all the Members as of the beginning of such period.

OA ¶ 9(a). Section 9(b) simply states how the Company will allocate tax items and requires that AHT follow IRC § 704(c). ¶ 9(b).

During AHT's winding up, the procurement of the Madoff settlement constitutes realized profit. Neither party contends that AHT has debts or liabilities that are owed to third parties. The settlement, therefore, is a net profit for the company and, pursuant to the OA, each member's share shall be credited to his or her capital account. Like *Beacon Associates*, AHT's OA contemplates that each member be given his or her share of the net profits.

At issue, however, is how to calculate each member's capital account balance. Should each member's capital account balance be the amount stated on the books as of December 2008 or should each member's capital account be recalculated to account for the "fictitious profits" enjoyed by AHT? Like *Beacon Associates*, AHT's OA states that net losses are to be allocated to members in proportion to their account as of the beginning of such period taking into account the sum of all capital accounts at the beginning of the same period. *See* OA ¶ 9(a). While the OA in the present matter does not state that the values of these capital accounts are "final, binding, and conclusive," the plain language of the OA clearly states that net profits and losses are to be calculated during each period. "Period" is not defined in AHT's OA; however, this term can be reasonably interpreted to mean "fiscal period," because every other mention of the word "period" in the OA refers to the "fiscal period." The only exception included in this section is that the percentage of allocations must be in accordance with IRC § 704(c), which does not alter this analysis. Thus, the timing of allocations seems to be clearly stated in the OA. Each Member's capital account balance should be the amount stated on the books as of December 2008 and should not be recalculated to account for "fictitious profits."

Additionally, as Defendant argues, the OA states that each Member's capital account shall be adjusted as required by § 704(b) of the IRC and the regulations thereunder. OA ¶ 7; Hurwitz Memo in Support Mot. Summ. J. 10. 26 C.F.R. § 1.165-8, which was promulgated under IRC § 704(b), states that "a loss from criminal fraud or embezzlement in a transaction entered into for profit is a theft loss, not a capital loss, under § 165." Rev. Rul. 2009-9 (I.R.S. 2009). Theft losses, under § 165, "shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." 26 U.S.C. § 165(e).

The court in *Beacon Associates* reasoned that "because Beacon's Operating Agreement requires that capital accounts be maintained in accordance with Federal Treasury Rules and because the IRS has ruled that losses attributable to Ponzi schemes be reported in the year they are discovered, Beacon's Operating Agreement must be read as requiring that Madoff theft losses, including those losses owing to 'fictitious profits,' be allocated among its Members' capital accounts in proportion to their interest in Beacon as recorded in December 2008, when Madoff's fraud was discovered." *Beacon Assocs. Mgmt. Corp.*, 725 F. Supp. 2d. at 464. Likewise, AHT's net profits should be credited to their respective accounts with capital account balances to be calculated as of December 2008 when the Madoff criminal fraud was discovered.

As to the issue of Member voting, it is uncontested that the OA does not have a specific provision regarding voting. The OA merely states "[t]he Managing Members shall consult with the other Members as they deem advisable." OA ¶ 10(f). Here, the Managing Members consulted with the other Members, conducted a vote, and the Members voted for the "Net Investment Method." This vote has no binding effect on the Managing Members or the Court.

Traditional contract interpretation largely guides the Court's discussion in this matter. This Court echoes *Beacon Associates* when it notes that the "vast majority" of cases Plaintiff references are all inapplicable because they deal with a party who was, itself, a Ponzi scheme. AHT, like Beacon, is not, itself, a Ponzi scheme and has a valid operating agreement that addresses the winding down process.

> Whereas [Madoff Securities] was subject to the Securities Investor Protection Act ("SIPA") requiring that "customers share *pro rata* in customer property to the extent of their net equities, as defined in SIPA" . . . Beacon is governed by its Operating Agreement which requires that Beacon's assets be distributed in accordance with the Valuation Method. *The Court is not aware of any legal authority that would allow it to upset this contract between and among Beacon's members, and is unpersuaded that equity demands it.*

*Beacon Assocs. Mgmt. Corp.*, 725 F. Supp. 2d. at 464 (emphasis added). Similarly, this Court is also not aware of any legal authority that would allow it to discard AHT's OA.

## Conclusion

For the reasons stated above, the plain language of AHT's Operating Agreement calls for the Managing Members to utilize the Capital Account Method in distributing the Madoff Settlement to AHT's members.

*Order*

This matter came to the Court upon Defendant Hurwitz's Motion for Summary Judgment. For the reasons stated in the Court's letter opinion, the plain language of AHT's Operating Agreement calls for the Managing Members to utilize the Capital Account Method in distributing the Madoff Settlement to AHT's members. It is ordered that Defendant Hurwitz's Motion for Summary Judgment is granted.