346 Conn. 33 FEBRUARY, 2023 33

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

CONNECTICUT DERMATOLOGY GROUP, PC, ET AL.
*v.* TWIN CITY FIRE INSURANCE
COMPANY ET AL.
(SC 20695)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Keller, Js.

*Syllabus*

The plaintiffs, which own and operate healthcare facilities in Connecticut,
sought, inter alia, a judgment declaring that the defendant insurers
were required to provide coverage under certain commercial insurance
policies for losses the plaintiffs sustained as a result of their suspension
of business operations during the COVID-19 pandemic. The defendants
insured the plaintiffs under separate but virtually identical insurance
policies, which provided that the defendants would "pay for direct physi-
cal loss of or physical damage to" covered property caused by or
resulting from a covered cause of loss. The policies included a business
income provision providing that the defendants would pay for the actual
loss of business income they sustained "due to the necessary suspension
of" their operations during the "period of restoration," which the policies
defined in relevant part as beginning "with the date of direct physical loss
. . . caused by or resulting from a [c]overed . . . [l]oss" and ending
on the date when the property "should be repaired, rebuilt or replaced
. . . ." The policies also contained an exclusion for loss or damage
caused by the presence, growth, proliferation, or spread of a virus. In
response to the COVID-19 pandemic, various government officials and
agencies had issued orders, recommendations and guidelines intended
to prevent or slow the spread of the disease. In light of this response,
the plaintiffs suspended their business operations and, as a result, lost
business income and incurred costs in connection with sanitation and
the erection of physical barriers, for which they submitted claims to
the defendants. The defendants denied the plaintiffs' claims on the
ground that, because the coronavirus did not cause property damage
at the plaintiffs' respective places of business, the claimed losses were
not covered. The parties filed separate motions for summary judgment.
The plaintiffs and the defendants disputed whether the policies cover
the claimed losses, which depended on whether there was a "direct
physical loss" of covered property. The defendants alternatively claimed
that any loss that otherwise would have been covered was subject to
the virus exclusion. The trial court concluded that the plaintiffs' claims
were subject to the virus exclusion, granted the defendants' motion for
summary judgment, and rendered judgment thereon, from which the
plaintiffs appealed. On appeal, the plaintiffs claimed that the trial court

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

incorrectly had concluded that their claims were subject to the virus exclusion.

*Held* that this court affirmed the trial court's judgment on the alternative ground that there was no genuine issue of material fact as to whether the policies did not cover the plaintiffs' claims, as the plaintiffs did not suffer a direct physical loss to their covered property:

The plain meaning of the phrase "direct physical loss" of property in the insurance policies did not include the suspension of business operations on a physically unaltered property in order to prevent the transmission of the coronavirus, as the ordinary usage of that phrase clearly and unambiguously required some physical, tangible alteration to or deprivation of the property that renders it physically unusable or inaccessible, and that interpretation was supported by Connecticut case law and the overwhelming majority of federal and sister state courts construing similar or identical policy language, as well as the dictionary definitions of the words "direct," "loss," and "physical."

Viewing the phrase "direct physical loss" in the context of the business income provisions in the insurance policies further supported this interpretation because the policies expressly distinguish between a loss resulting from "the necessary suspension of" an insured's operations and the "direct physical loss" of property and make payment for the former conditional on the latter, and, if "the necessary suspension of" operations were, itself, a "direct physical loss," that distinction would serve no purpose.

The provision in the insurance policies defining "period of restoration" to provide that the loss of business income is covered while the property is being "repaired, rebuilt or replaced" also strongly suggested that a "direct physical loss," unlike a loss resulting from the necessary suspension of business operations to avoid the transmission of a communicable disease, involves a physical alteration of the property such that the property is susceptible to being restored to its original condition.

Moreover, this court rejected the plaintiffs' argument that the COVID-19 pandemic physically transformed their properties from ordinary businesses into "potential viral incubators," as the record lacked any indication that the plaintiffs' properties underwent any physical transformation; rather, the pandemic caused a transformation in governmental and societal expectations and behavior that had a seriously negative impact on the plaintiffs' businesses.

Likewise, this court rejected the plaintiffs' argument that an insured necessarily suffers a physical loss of a property whenever it loses the productive use of the property, as "use of property" and "property" are not the same thing because the loss of the former does not necessarily imply the loss of the latter, and also rejected their argument that their

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

efforts to achieve and maintain a safe environment, including erecting physical barriers, supported their claim that they suffered a direct physical loss, as those activities were designed to prevent the transmission of the coronavirus on the properties and were not, as the plaintiffs claimed, "repairs" in any ordinary sense of the word.

Although the plaintiffs' contention that the coverage provision for "direct physical loss" of property applied to their claims, even though there has been no physical, tangible alteration of their properties, no persistent, physical contamination of the properties rendering them uninhabitable, and no imminent threat of physical damage to or destruction of the properties rendering them unusable or inaccessible, was not frivolous, the mere fact that the parties advanced different interpretations of an insurance policy does not necessitate a conclusion that the policy language was ambiguous, and, in light of the entirety of the insurance policies at issue, the plaintiffs' interpretation was not reasonable.

Argued September 15, 2022—officially released January 27, 2023*

*Procedural History*

Action for a judgment declaring that the defendants were obligated to provide coverage under certain insurance policies for the plaintiffs' alleged business losses as a result of the COVID-19 pandemic, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the Complex Litigation Docket, where the court, *Noble, J.*, denied the plaintiffs' motion for summary judgment, granted the defendants' motion for summary judgment and rendered judgment thereon, from which the plaintiffs appealed. *Affirmed.*

*R. Cornelius Danaher, Jr.*, with whom were *Thomas J. Plumridge* and, on the brief, *Calum B. Anderson*, *Allan Kanner*, pro hac vice, and *Cynthia St. Amant*, pro hac vice, for the appellants (plaintiffs).

*Jonathan M. Freiman*, with whom were *Ariela C. Anhalt* and, on the brief, *Sarah D. Gordon*, pro hac vice, *Erica Gerson*, pro hac vice, and *Justin Ben-Asher*, pro hac vice, for the appellees (defendants).

* January 27, 2023, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

*Opinion*

ROBINSON, C. J. The dispositive issue in this appeal is whether a property insurance policy providing coverage for "direct physical loss of or physical damage to" covered property provides coverage for business income losses arising from the suspension of business operations during the COVID-19 pandemic. The plaintiffs, Connecticut Dermatology Group, PC (Connecticut Dermatology), Live Every Day, LLC (Live Every Day), and Ear Specialty Group of Connecticut, PC (Ear Specialty Group), own and operate healthcare facilities at various locations in Connecticut. They suspended their business operations during the COVID-19 pandemic and, as a result, lost business income and incurred other expenses. The plaintiffs filed claims for their losses with the defendants, Twin City Fire Insurance Company, Sentinel Insurance Company, Ltd., Hartford Fire Insurance Company, doing business as The Hartford, and the Hartford Financial Services Group, Inc., under insurance policies containing provisions requiring the insurance companies to "pay for direct physical loss of or physical damage to" covered property caused by a covered cause of loss. The defendants denied the claims, and the plaintiffs brought this action seeking, among other things, a judgment declaring that the insurance policies covered their economic losses. The plaintiffs now appeal[1] from the trial court's granting of the defendants' motion for summary judgment on the ground that the claimed losses were subject to a virus exclusion in the policies. We affirm the trial court's judgment on the alternative ground that there is no genuine issue of material fact as to whether the policies did not cover the plaintiffs' claims because the plaintiffs

_____

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we granted the defendants' motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

did not suffer any direct physical loss of covered property.

The record, which we view in the light most favorable to the plaintiffs for purposes of reviewing the trial court's rendering of summary judgment, reveals the following facts and procedural history. The plaintiffs are insured under separate but identical commercial insurance policies issued by the defendants.[2] The policies provide in relevant part that the defendants "will pay for direct physical loss of or physical damage to [c]overed [p]roperty at the premises described in the [d]eclarations (also called 'scheduled premises' . . .) caused by or resulting from a [c]overed [c]ause of [l]oss." In addition, the policies provide that the defendants "will pay for the actual loss of [b]usiness [i]ncome [the insured] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration' " and for "reasonable and necessary [e]xtra [e]xpense [the insured] incur[s] during the 'period of restoration' that [it] would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises' . . . ." The policies define "period of restoration" in relevant part as "the period of time that: (a) [b]egins with the date of direct physical loss or physical damage caused by or resulting from a [c]overed [c]ause of [l]oss at the 'scheduled premises,' and (b) [e]nds on the date when: (1) [t]he property at the 'scheduled premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality; (2) [t]he date when [the insured's] business is resumed at a new, permanent location. . . ."

In early 2020, the world experienced the outbreak of the highly virulent infectious disease known as COVID-

[2] The defendants are interrelated corporate entities, and there is some dispute as to which defendant is responsible for paying the claim submitted by each specific plaintiff. Because these issues are complex and have no bearing on the issue before us in this appeal, we do not address them.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

19. The outbreak and ensuing pandemic were fueled by close contact between people in indoor spaces. In response to the pandemic, government officials and agencies at both the state and federal levels issued numerous emergency orders, recommendations and guidelines intended to prevent or slow the spread of the disease. These decrees directed people to stay at home if possible, imposed social distancing rules, limited occupancy of certain buildings, and urged the installation of Plexiglass barriers, increased ventilation and the regular disinfection of surfaces to prevent transmission of the coronavirus inside buildings. One such order, which temporarily required the elimination of in-person workforces for nonessential businesses and required telecommuting or work from home "to the maximum extent possible" for all other businesses or not-for-profit entities, was Governor Ned Lamont's Executive Order 7H,[3] which he issued on March 20, 2020. The order classified "hospitals, clinics" and "companies and institutions involved in . . . any other healthcare related supplies or services" as "essential" businesses.

In response to the pandemic, in March, 2020, the plaintiffs suspended the operation of their businesses.[4]

---

[3] Executive Order 7H provides in relevant part: "Effective on March 23, 2020, at [8] p.m. and through April 22, 2020, unless earlier modified, extended, or terminated by [the governor], all businesses and not-for-profit entities in the state shall employ, to the maximum extent possible, any telecommuting or work from home procedures that they can safely employ. [Nonessential] businesses or not-for-profit entities shall reduce their in-person workforces at any workplace locations by 100 [percent] not later than March 23, 2020 at [8] p.m. Any essential business or entity providing essential goods, services or functions shall not be subject to these in-person restrictions. . . ."

[4] The plaintiffs make no claim that they were required by law to suspend the operation of their businesses, and they have abandoned any claim that they are entitled to coverage pursuant to the "civil authority" clause of the insurance policies providing coverage for the actual loss of business income sustained when access to the covered property is specifically prohibited by order of a civil authority as the direct result of a covered cause of loss to property in the immediate area of a covered premises.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

As a result, they suffered losses of business income. The plaintiffs also incurred costs in connection with the daily sanitation of their premises and the erection of physical barriers to protect patients and staff and to minimize the suspension of normal operations. They submitted claims for their losses to the defendants, which either denied the claims or failed to respond.[5] In their letters denying the claims, the defendants stated that, "[because] the coronavirus did not cause property damage at [the insured's] place of business or in the immediate area, this business income loss is not covered."

Thereafter, the plaintiffs brought this action seeking, among other things, a judgment declaring that the defendants were obligated to provide coverage for "sue and labor" expenses,[6] current and future lost business income, and "extra expense" related to the costs of daily sanitation and erecting physical barriers during the suspension of operations.[7] In their answer, the defendants denied the plaintiffs' substantive allegations and claimed as a special defense that, if the plaintiffs suffered any losses that would otherwise be covered by the insurance policies, the losses were subject to an exclusion for "loss or damage caused directly or indirectly by . . . [the] [p]resence, growth, proliferation, spread or any activity

[5] According to the plaintiffs, Connecticut Dermatology received no response to its claim.

[6] The insurance policies require that, in the event of a loss, the insureds take all reasonable steps to protect the covered property from further damage. Coverage for these expenses is commonly known as "sue and labor" coverage.

[7] Connecticut Dermatology, which received no response to its claim; see footnote 5 of this opinion; sought a judgment declaring that its losses were covered by its insurance policy. Live Every Day and Ear Specialty Group sought damages for breach of the covenant of good faith and fair dealing and for violations of the Connecticut Unfair Insurance Practices Act, General Statutes § 38a-815 et seq., and the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., based on the denial of their claims.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

of 'fungi,' wet rot, dry rot, bacteria or virus" (virus exclusion).[8]

The parties filed separate motions for summary judgment. In their motion, the defendants contended, among other things, that there was no genuine issue of material fact as to whether the insurance policies did not cover the claimed losses because there was no " 'direct physical loss of or physical damage to' " any property covered by the policies. In addition, the defendants contended that there was no genuine issue of material fact as to whether, if there was a loss that otherwise would be covered, it was subject to the virus exclusion. In their motion, the plaintiffs claimed, among other things, that there was no genuine issue of material fact as to whether the insurance policies provided coverage because the plaintiffs had suffered a "direct physical loss" of covered property. The trial court concluded that the plaintiffs' claims were subject to the virus exclusion and rendered summary judgment for the defendants. This appeal followed.

On appeal, the plaintiffs claim that the trial court incorrectly concluded that their claims were subject to the virus exclusion. The defendants disagree and further contend, as an alternative ground for affirmance, that the insurance policies did not cover the losses because there was no "direct physical loss of or physical damage to" any property covered by the policies. We agree with the defendants that the insurance policies do not cover the plaintiffs' losses, and, therefore, we need not decide whether the trial court correctly determined that their claims were subject to the virus exclusion. See, e.g., *State* v. *Burney*, 288 Conn. 548, 560, 954 A.2d 793 (2008) ("[i]t is well established that this court may rely on any grounds supported by the record in

---

[8] The defendants also raised other special defenses that are not relevant to this appeal.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

affirming the judgment of a trial court''); see also, e.g., *Grady* v. *Somers*, 294 Conn. 324, 349–50 n.28, 984 A.2d 684 (2009) (addressing alternative ground for affirmance that trial court did not reach because it involved question of law over which review was plenary).

"The standard of review of a trial court's decision to grant summary judgment is well established. [W]e must decide whether the trial court erred in determining that there was no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is whether a party would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) *Heisinger* v. *Cleary*, 323 Conn. 765, 776, 150 A.3d 1136 (2016). "This court's review of the trial court's decision to grant summary judgment in favor of the defendants is plenary." Id., 777.

"The general principles that guide our review of insurance contract interpretations are well settled. [C]onstruction of a contract of insurance presents a question of law for the court [that] this court reviews de novo. . . . An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract. . . . In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . Under those circumstances, the policy is to be given effect according to its terms. . . . When interpreting [an insurance policy], we must look at the contract as a whole, consider all relevant

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . .

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." (Internal quotation marks omitted.) *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 311 Conn. 29, 37–38, 84 A.3d 1167 (2014).

"[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Afkari-Ahmadi* v. *Fotovat-Ahmadi*, 294 Conn. 384, 391, 985 A.2d 319 (2009). Rather, "[an insurance] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." (Internal quotation marks omitted.) *Enviro Express, Inc.* v. *AIU Ins. Co.*, 279 Conn. 194, 199, 901 A.2d 666 (2006). The contract is ambiguous only if, after considering the ordinary meaning of the language in dispute and the entirety of the insurance contract, the court determines that the language is susceptible to more than one reasonable interpretation.[9] See id.

_____

[9] This court previously has stated that the "rule of construction that favors the insured in case of ambiguity applies only when the terms are, without violence, susceptible of two [*equally reasonable*] interpretations . . . ."

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

With these principles in mind, we address the plaintiffs' claim that the policy provision covering "direct physical loss of . . . [p]roperty" covers the losses caused by the suspension of their business operations during the COVID-19 pandemic. We begin our analysis with the language of the relevant insurance policy provisions. The policy provides: "We [i.e., the insurance companies] will pay for *direct physical loss of or physical damage* to [c]overed [p]roperty at the premises described in the [d]eclarations . . . caused by or resulting from a [c]overed [c]ause of [l]oss." (Emphasis added.) This provision is contained in the portion of the policy entitled "Special Property Coverage Form." "Covered property" is defined to include buildings described in the declarations; permanent fixtures, machinery and equipment; building glass; personal property owned by the insured that it uses to maintain or service the buildings or structures on the premises; and personal property such as tools and equipment that the insured uses in its business.

Although this court has not previously construed this specific policy language, we considered the meaning of a similar policy provision in *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 67 A.3d 961 (2013) (*Capstone*). The general liability policy at issue in that case contained a provision covering "[p]hysical injury to tangible property, including all resulting loss of use of that property." (Internal quotation marks omitted.) Id., 782. We rejected the plaintiffs' claim in *Capstone* that this provision entitled them to coverage for the loss of the use of defectively installed chimneys, which resulted in the escape of carbon monoxide into

(Emphasis added; internal quotation marks omitted.) *Misiti, LLC* v. *Travelers Property Casualty Co. of America*, 308 Conn. 146, 155, 61 A.3d 485 (2013). We question whether the interpretations must be *equally* reasonable for the disputed term to be ambiguous. Because we conclude in the present case that the plaintiffs' interpretation simply is not reasonable when considered in light of the entirety of the contract, we need not resolve this question.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

the building, on the ground that "the gas caused no physical, tangible alteration to any property," and, therefore, under the plain language of the policy provision, "the loss of use of the defective chimneys, standing alone, did not constitute property damage . . . ." (Internal quotation marks omitted.) Id., 782–83; see id., 767–69.

We find instructive a recent decision from the United States Court of Appeals for the Second Circuit that followed our decision in *Capstone* in concluding that losses resulting from the suspension of business operations because of the COVID-19 pandemic were not covered under similar policy language requiring a physical loss or physical damage. In *Farmington Village Dental Associates, LLC* v. *Cincinnati Ins. Co.*, Docket No. 21-2080-cv, 2022 WL 2062280, *1 (2d Cir. June 8, 2022), the United States Court of Appeals for the Second Circuit, extrapolating from *Capstone*, concluded that, under Connecticut law, a policy covering " 'accidental physical loss or accidental physical damage' " to property did not cover a loss incurred as result of the suspension of business operations during the COVID-19 pandemic because the loss was not physical, and the virus did not tangibly alter the property.[10] Id., *1. The overwhelming

---

[10] Recent decisions from the United States District Court for the District of Connecticut are consistent with the Second Circuit's decision in *Farmington Village Dental Associates, LLC*. See *ITT, Inc.* v. *Factory Mutual Ins. Co.*, Docket No. 3:21CV00156 (SALM), 2022 WL 1471245, *10 (D. Conn. May 10, 2022) (under Connecticut law, "the phrase physical loss or damage does not extend to mere loss of use of a premises, [when] there has been no physical damage to such premises; those terms instead require actual physical loss of or damage to the insured's property" and, therefore, do not cover loss incurred as result of suspension of business operations during COVID-19 pandemic (internal quotation marks omitted)), appeal filed (2d Cir. June 6, 2022) (No. 22-1245); *Great Meadow Cafe* v. *Cincinnati Ins. Co.*, Docket No. 3:21-CV-00661 (KAD), 2022 WL 813796, *6 (D. Conn. March 17, 2022) (under Connecticut law, "direct physical loss" requires "physical damage or physical alteration" and does not include loss incurred as result of suspension of business operations during COVID-19 pandemic); *Connecticut Children's Medical Center* v. *Continental Casualty Co.*, 581 F. Supp. 3d 385, 392–93 (D. Conn. 2022) (under Connecticut law, loss incurred as result of suspension of business operations during COVID-19 pandemic was not direct

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

majority of federal and state courts construing language similar or identical to the language contained in the policies at issue in the present case have reached the same conclusion.[11] This reading of the term "direct

physical loss of property), appeal filed (2d Cir. February 17, 2022) (No. 22-322).

The plaintiffs contend that, notwithstanding the Second Circuit's reliance in *Farmington Village Dental Associates, LLC*, on our decision in *Capstone*, any reliance on *Capstone* in the present case is misplaced because *Capstone* involved a claim for property *damage*, whereas they are making claims for *physical loss* of property. The plaintiffs point out that this court in *Capstone* expressly declined to address "the issue of whether the presence of carbon monoxide would meet the policy's second definition of property damage, 'loss of use of tangible property that is not physically injured.' " *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 783 n.21. In addition, the plaintiffs point out that *Capstone* involved a third-party general liability insurance policy, whereas they are making claims under a first-party property insurance policy. Although we agree that our decision in *Capstone* is not directly on point, it does provide some insight into the meaning of the term "physical," as applied to claims involving the loss of or damage to property. In any event, even if the plaintiffs were correct that *Capstone* provides *no* insight into the meaning of "direct physical loss," as used in their policies, that would not change our conclusion, based on the other reasons stated herein, that the phrase does not include losses resulting from the suspension of business operations during the COVID-19 pandemic.

[11] See *Rock Dental Arkansas, PLLC* v. *Cincinnati Ins. Co.*, 40 F.4th 868, 871 (8th Cir. 2022) (under Arkansas law, "accidental physical loss" "requires some physicality to the loss or damage of property—e.g., a physical alteration, physical contamination, or physical destruction" (internal quotation marks omitted)); *United Talent Agency* v. *Vigilant Ins. Co.*, 77 Cal. App. 5th 821, 834, 293 Cal. Rptr. 3d 65 (2022) (under California law, property insurance policy did not cover loss incurred as result of suspension of business operations during COVID-19 pandemic under "the generally recognized principle in the context of [first-party] property insurance that mere loss of use of physical property to generate business income, without any other physical impact on the property, does not give rise to coverage for direct physical loss" (internal quotation marks omitted)); *Commodore, Inc.* v. *Certain Underwriters at Lloyd's London*, 342 So. 3d 697, 702, 704–705 (Fla. App. 2022) (under Florida law, "because the ordinary meaning of 'physical' carries a tangible aspect, 'direct physical loss' requires some actual alteration to the insured property" and does not include loss incurred as result of suspension of business operations during COVID-19 pandemic); *Gilreath Family & Cosmetic Dentistry, Inc.* v. *Cincinnati Ins. Co.*, Docket No. 21-11046, 2021 WL 3870697, *2 (11th Cir. August 31, 2021) (under Georgia law, "accidental physical loss" does not include loss incurred as result of suspension of business operations during COVID-19 pandemic because loss requires "an actual change in insured property that either makes the property

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

unsatisfactory for future use or requires that repairs be made'' (internal quotation marks omitted)); *Firebirds International, LLC* v. *Zurich American Ins. Co.*, Docket No. 1-21-0558, 2022 WL 1604438, \*8 (Ill. App. May 20, 2022) (under Illinois law, policy covering ''direct physical loss'' to covered property did not ''cover losses resulting from intangible causes that are not tied to actual physical damage to property,'' such as loss incurred as result of suspension of business operations during COVID-19 pandemic); *Indiana Repertory Theatre* v. *Cincinnati Casualty Co.*, 180 N.E.3d 403, 410 (Ind. App.) (under Indiana law, policy covering '' 'direct physical loss' '' did not cover loss incurred as result of suspension of business operations during COVID-19 pandemic because property ''did not suffer any damage or alteration [but] . . . was unusable for its intended purpose because of an outside factor''), transfer denied, 193 N.E.3d 372 (Ind. 2022); *Wakonda Club* v. *Selective Ins. Co. of America*, 973 N.W.2d 545, 552 (Iowa 2022) (under Iowa law, insurance policy covering '' 'direct physical loss' '' of covered property ''requires there to be a physical aspect to the loss of the property'' and does not cover business income losses caused by suspension of business operations during COVID-19 pandemic); *Q Clothier New Orleans, LLC* v. *Twin City Fire Ins. Co.*, 29 F.4th 252, 258–59 (5th Cir. 2022) (under Louisiana law, ''the unambiguous meaning of 'direct physical loss of or damage to property' '' does not include loss incurred as result of suspension of business operations during COVID-19 pandemic because ''that loss is not tangible . . . [or] an alteration, injury, or deprivation of *property*'' (emphasis in original; footnote omitted)); *GPL Enterprise, LLC* v. *Certain Underwriters at Lloyd's*, 254 Md. App. 638, 645, 653–54, 276 A.3d 75 (2022) (under Maryland law, ''direct physical loss or damage to property does not include loss of use unrelated to tangible, physical damage,'' such as loss incurred as result of suspension of business operations during COVID-19 pandemic (internal quotation marks omitted)); *Verveine Corp.* v. *Strathmore Ins. Co.*, 489 Mass. 534, 542–44, 184 N.E.3d 1266 (2022) (under Massachusetts law, ''direct physical loss of or damage to property requires some distinct, demonstrable, physical alteration of the property'' and does not include loss incurred as result of suspension of business operations during COVID-19 pandemic (internal quotation marks omitted)); *Gavrilides Management Co., LLC* v. *Michigan Ins. Co.*, Docket No. 354418, 2022 WL 301555, \*4, \*5 (Mich. App. February 1, 2022) (under Michigan law, as used in phrase ''direct physical loss,'' ''the word 'physical' necessarily requires the loss or damage to have some manner of tangible and measurable presence or effect in, on, or to the premises'' and does not include loss incurred as result of suspension of business operations during COVID-19 pandemic), appeal denied, 981 N.W.2d 725 (Mich. 2022); *Monday Restaurants* v. *Intrepid Ins. Co.*, 32 F.4th 656, 657–59 (8th Cir. 2022) (under Missouri law, '' 'direct physical loss' '' unambiguously does not include loss incurred as result of suspension of business operations during COVID-19 epidemic because loss was not physical); *Circus Circus LV, LP* v. *AIG Specialty Ins. Co.*, Docket No. 21-15367, 2022 WL 1125663, \*1–2 (9th Cir. April 15, 2022) (under Nevada law, ''direct physical loss'' does not include loss incurred as result of suspension of business operations during COVID-19 pandemic because ''the loss must be due to a distinct, demonstrable, physical alteration of the property'' (internal

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

quotation marks omitted)); *AC Ocean Walk, LLC* v. *American Guarantee & Liability Ins. Co.*, Docket No. A-1824-21, 2022 WL 2254864, *13 (N.J. Super. App. Div. June 23, 2022) (under New Jersey law, "[the coronavirus'] presence and/or the [government mandated] shutdown does not constitute a direct physical loss of or damage to" property); *Consolidated Restaurant Operations, Inc.* v. *Westport Ins. Corp.*, 205 App. Div. 3d 76, 85, 167 N.Y.S.3d 15 (under New York law, "physical loss or damage in an insurance policy requires actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves [i.e., the COVID-19 pandemic], or the adverse business consequences that flow from such closure" (internal quotation marks omitted)), appeal granted in part, 39 N.Y.3d 943, 198 N.E.3d 788, 177 N.Y.S.3d 545 (2022); *North State Deli, LLC* v. *Cincinnati Ins. Co.*, 284 N.C. App. 330, 333–34, 875 S.E.2d 590 (2022) (under North Carolina law, " 'physical loss' " unambiguously does not include loss incurred as result of suspension of business operations during COVID-19 pandemic); *Nail Nook, Inc.* v. *Hiscox Ins. Co.*, 182 N.E.3d 356, 359–60 (Ohio App. 2021) (under Ohio law, policy covering " 'direct physical loss of . . . [c]overed [p]roperty' " plainly and unambiguously does not cover loss incurred as result of suspension of business operations during COVID-19 pandemic); *Goodwill Industries of Central Oklahoma, Inc.* v. *Philadelphia Indemnity Ins. Co.*, 21 F.4th 704, 710 (10th Cir. 2021) (under Oklahoma law, " 'direct physical loss' " does not include loss incurred as result of suspension of business operations during COVID-19 pandemic because that term "requires an immediate and perceptible destruction or deprivation of property"), cert. denied,        U.S.        , 142 S. Ct. 2779, 213 L. Ed. 2d 1017 (2022); *Sullivan Management, LLC* v. *Fireman's Fund Ins. Co.*, 437 S.C. 587, 592, 879 S.E.2d 742 (2022) (under South Carolina law, "mere loss of access to a business [during the COVID-19 pandemic] is not the same as direct physical loss or damage"); *Terry Black's Barbecue, LLC* v. *State Automobile Mutual Ins. Co.*, 22 F.4th 450, 456 (5th Cir. 2022) (under Texas law, "the plain meaning of 'physical loss' " did not cover loss incurred as result of suspension of business operations during COVID-19 pandemic because loss did not involve "any tangible alteration or deprivation of . . . property"); *Hill & Stout, PLLC* v. *Mutual of Enumclaw Ins. Co.*, 200 Wn. 2d 208, 220, 515 P.3d 525 (2022) (under Washington law, "the claim for loss of intended use and loss of business income [during the COVID-19 pandemic] is not a *physical* loss of property" (emphasis in original)); *Uncork & Create, LLC* v. *Cincinnati Ins. Co.*, 27 F.4th 926, 932, 933 (4th Cir. 2022) (under West Virginia law, "the plain understanding of the terms 'physical loss' or 'physical damage' is material destruction or material harm," and those terms did not include loss incurred as result of suspension of business operations during COVID-19 pandemic); *Colectivo Coffee Roasters, Inc.* v. *Society Ins.*, 401 Wis. 2d 660, 672, 974 N.W.2d 442 (2022) (under Wisconsin law, "the presence of [the coronavirus] does not constitute a physical loss of or damage to property because it does not alter the appearance, shape, color, structure, or other material dimension of the property" (internal quotation marks omitted)).

We note that there is some authority to the contrary. See *In re Society Ins. Co. COVID-19 Business Interruption Protection Ins. Litigation*, 521

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

physical loss of . . . [p]roperty” is supported by the dictionary definitions of the words “direct,” “loss” and “physical.”[12]

F. Supp. 3d 729, 742 (N.D. Ill. 2021) (under Illinois law, reasonable jury could find that restaurants’ suspension of business operations during COVID-19 pandemic constituted direct physical loss because “the restaurants [were] limited from using much of their physical space”); *Derek Scott Williams, PLLC* v. *Cincinnati Ins. Co.*, 522 F. Supp. 3d 457, 461, 463 (N.D. Ill. 2021) (under Texas law, “a reasonable [fact finder] could find that the term ‘physical loss’ is broad enough to cover . . . a deprivation of the use of [the] business premises” during COVID-19 pandemic). For the reasons that we explain more fully hereinafter in this opinion, we do not agree with the reasoning of these courts to the extent that they suggest that a limitation on the use of a property that results in a loss of business income, but that does not involve physical or tangible alteration of or physically prevent access to the property, constitutes a direct physical loss.

[12] See *Uncork & Create, LLC* v. *Cincinnati Ins. Co.*, 27 F.4th 926, 932 (4th Cir. 2022) (“In this context, the word ‘physical’ means ‘relating to natural or material things’ [Webster’s Third New International Dictionary (2002) p. 1706] and the word ‘loss’ means ‘the state or fact of being destroyed or placed beyond recovery: destruction, ruin.’ [Id., p. 1338.] Finally, the word ‘damage’ in this context means an ‘injury or harm . . . to property.’ [Id., p. 571.] Thus, with reference to a defined premises, the plain understanding of the terms ‘physical loss’ or ‘physical damage’ is material destruction or material harm.”); *Estes* v. *Cincinnati Ins. Co.*, 23 F.4th 695, 700 (6th Cir. 2022) (“Dictionaries confirm that the ‘average person’ would interpret the phrase ‘direct physical loss’ in this fashion. . . . The word ‘direct’ means ‘stemming immediately from a source.’ [Merriam Webster’s Collegiate Dictionary (11th Ed. 2014) p. 353.] The word ‘physical’ means ‘of or relating to material things.’ [Id., p. 935.] And the word ‘loss’ means ‘destruction’ or ‘deprivation’ (that is, ‘the act of losing possession’). [Id., p. 736; see also, e.g., American Heritage Dictionary of the English Language (5th Ed. 2018) pp. 511, 1037, 1331.] Putting these definitions together, a covered source itself must destroy covered property or deprive the property’s owner of possession.” (Citations omitted.)); *Goodwill Industries of Central Oklahoma, Inc.* v. *Philadelphia Indemnity Ins. Co.*, 21 F.4th 704, 710 (10th Cir. 2021) (under dictionary “definitions, a ‘direct physical loss’ requires an immediate and perceptible destruction or deprivation of property”), cert. denied,      U.S.     , 142 S. Ct. 2779, 213 L. Ed. 2d 1017 (2022); *Santo’s Italian Café, LLC* v. *Acuity Ins. Co.*, 15 F.4th 398, 401 (6th Cir. 2021) (“Whether one sticks with the terms themselves (a ‘direct physical loss of’ property) or a thesaurus-rich paraphrase of them (an ‘immediate’ ‘tangible’ ‘deprivation’ of property), the conclusion is the same. The policy does not cover this loss [resulting from the suspension of business operations during the COVID-19 pandemic].”); *Commodore, Inc.* v. *Certain Underwriters at Lloyd’s London*, 342 So. 3d 697, 702 (Fla. App. 2022) (“Because the . . . dictionary defines ‘loss’ as ‘losing possession and deprivation’ . . . we look, in turn, to the definition of ‘deprivation’: ‘the state of being kept from possessing, enjoying, or using something.’ . . . But the use of ‘deprivation’ as a synonym for ‘loss’ does not address [the] fact that the phrase still

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

Viewing the phrase "direct physical loss of or physical damage to" in the context of the policies' business income provisions further supports this interpretation. The policy provides that the insurer "will pay for the actual loss of [b]usiness [i]ncome [the insured] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration.' " The policy further provides that the "period of restoration" "[b]egins with the date of direct physical loss or physical damage caused by or resulting from a [c]overed [c]ause of [l]oss at the 'scheduled premises' " and ends when the property "should be repaired, rebuilt or replaced with reasonable speed and similar quality . . . ." Thus, the policy expressly distinguishes between a loss resulting from "the necessary suspension of [the insured's] 'operations' " and the "direct physical loss of . . . [p]roperty," and makes payment for the former *conditional* on the latter. If the "necessary suspension of . . . 'operations' " were, itself, a "direct physical loss," this distinction would serve no purpose. See, e.g., *Afkari-Ahmadi* v. *Fotovat-Ahmadi*, supra, 294 Conn. 391 ("in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous" (internal quotation marks omitted)); see also *Uncork & Create, LLC* v. *Cincinnati Ins. Co.*, 27 F.4th 926, 932 (4th Cir. 2022)

requires 'physical' loss . . . . Physical . . . means 'of or relating to matter or the material world; natural; tangible, concrete.' . . . Thus, because the ordinary meaning of 'physical' carries a tangible aspect, 'direct physical loss' requires some actual alteration to the insured property." (Citations omitted; emphasis omitted.)); *Hill & Stout, PLLC* v. *Mutual of Enumclaw Ins. Co.*, 200 Wn. 2d 208, 219, 515 P.3d 525 (2022) (" 'Physical' is defined as 'of or belonging to all created existences in nature' and 'of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary.' [Webster's Third New International Dictionary (2002) p. 1706.] 'Loss' is defined most pertinently as 'the act or fact of losing : failure to keep possession : DEPRIVATION' and 'the state or fact of being destroyed or placed beyond recovery.' [Id., p. 1338.] It follows that a 'physical loss of . . . property' is a property that has been physically destroyed or that one is deprived of in that the property is no longer physically in [his or her] possession.").

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

("[a]ny alternative meaning of the terms 'physical loss' or 'physical damage' that does not require a material alteration to the property would render meaningless this [precondition] to coverage for business income loss"); cf. *Mudpie, Inc.* v. *Travelers Casualty Ins. Co. of America*, 15 F.4th 885, 892 (9th Cir. 2021) ("[t]o interpret the [p]olicy to provide coverage absent physical damage would render the 'period of restoration' clause superfluous").

Moreover, the provision defining "period of restoration" provides that the loss of business income is covered while the property is being "repaired, rebuilt or replaced . . . ." These terms strongly imply that a "direct physical loss," unlike a loss resulting from the necessary suspension of business operations to avoid the transmission of a communicable disease, is one that involves a physical alteration of the property such that the property is susceptible to being restored to its original condition.[13] See, e.g., *SA Palm Beach, LLC* v. *Certain Underwriters at Lloyd's London*, 32 F.4th 1347, 1361 (11th Cir. 2022) ("The need to repair, rebuild, replace, or expend time securing a new, permanent property is a [precondition] for coverage of lost business income and other expenses. Any alternative meaning of the terms physical loss or physical damage that does not require a material alteration to the property would render meaningless this [precondition] to coverage for business income loss." (Internal quotation marks omitted.)); *Oral Surgeons, P.C.* v. *Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021) ("[t]hat the policy provides coverage until property 'should be repaired, rebuilt or replaced' or until business resumes elsewhere assumes physical alteration of the property, not mere loss of use"); *Chief of Staff, LLC* v. *Hiscox Ins. Co.*,

---

[13] We address the plaintiffs' claim that they were required to "repair" their properties as the result of the COVID-19 pandemic subsequently in this opinion.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

532 F. Supp. 3d 598, 603 (N.D. Ill. 2021) ("[t]he uneasy fit between the 'period of restoration' language and [the claim that 'direct physical loss' covers the suspension of business operations during the COVID-19 pandemic] confirms that the better reading of the provision is the one that requires some physical change to the condition or location of property at the insured's premises").

We conclude, therefore, that the plain meaning of the term "direct physical loss of . . . [p]roperty" does not include the suspension of business operations on a physically unaltered property in order to prevent the transmission of the coronavirus. Rather, in ordinary usage, the phrase "direct physical loss of . . . [p]roperty" clearly and unambiguously means that there must be some physical, tangible alteration to or deprivation of the property that renders it physically unusable or inaccessible.[14]

[14] Quoting 10A S. Plitt et al., Couch on Insurance (3d Ed. Rev. 2005) § 148:46, p. 148-81, the plaintiffs contend that many of the cases holding that "direct physical loss" clearly requires some physical, tangible alteration of property are tainted by their reliance on a "misstatement" in a prominent insurance law treatise asserting that "physical loss" requires a " 'distinct, demonstrable, physical alteration of the property.' " Quoting R. Lewis et al., "Couch's 'Physical Alteration' Fallacy: Its Origins and Consequences," 56 Tort Trial & Ins. Prac. L.J. 621, 622 (2021), the plaintiffs point out that this statement recently has been sharply criticized as " 'wrong when [George J.] Couch first made it in the 1990s . . . and . . . wrong today.' " We note, however, that Couch also recognizes that there are exceptions to the "physical alteration" requirement in cases involving contamination by a harmful substance or an imminent threat of physical damage to property. See 10A S. Plitt, supra, § 148:46, p. 148-82 (observing that such cases allow "coverage based on physical damage despite the lack of physical alteration of the property"). These are the same types of cases that the authors of "Couch's 'Physical Alteration' Fallacy: Its Origins and Consequences" rely on to support their contention that Couch is wrong. For reasons that we discuss more fully hereinafter in this opinion, we conclude that the cases in which courts have found a physical loss, even though the insured property was not physically or tangibly altered, are distinguishable from the present case. Accordingly, even if we were to assume that some courts may have given undue weight to Couch's "physical alteration" requirement, that does not affect our analysis here.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

The plaintiffs raise numerous arguments in support of their claim that the insurance policies' coverage for "direct physical loss of or physical damage to" any insured property applies to their claims for business income losses and other expenses incurred as the result of the suspension of their business operations during the COVID-19 pandemic and their efforts to make the properties safer. The plaintiffs first suggest that they are seeking coverage for a "direct physical loss" of their properties because the COVID-19 pandemic physically transformed their "ordinary business properties" into "potential viral incubators that were imminently dangerous to human beings." Although we admire the ingenuity of this argument, the record does not indicate that there was any "physical transformation" of the plaintiffs' *properties* as the result of the COVID-19 pandemic. See *Verveine Corp.* v. *Strathmore Ins. Co.*, 489 Mass. 534, 543, 184 N.E.3d 1266 (2022) ("[a]lthough caused, in some sense, by the physical properties of the virus, the suspension of business [as a result of the COVID-19 pandemic is] not in any way attributable to a direct physical effect on the plaintiffs' property that can be described as loss or damage"). Rather, the COVID-19 pandemic caused a transformation in governmental and societal expectations and behavior that had a seriously negative impact on the plaintiffs' businesses.[15] See, e.g., *Inns by the Sea* v. *California Mutual Ins. Co.*, 71 Cal. App. 5th 688, 704, 286 Cal. Rptr. 3d 576 (2021) (The COVID-19 pandemic did not cause a direct physical loss of property because "[t]he property did not change. The world around it did." (Internal quotation marks omitted.)), review denied, California Supreme Court, Docket No. S272450 (March 9, 2022); E. Knutsen & J. Stempel, "Infected Judgment: Problematic Rush to Conventional Wisdom and Insurance Coverage

_____

[15] As we indicated, the plaintiffs in the present case make no claim that they were *required by law* to suspend their business operations.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

Denial in a Pandemic,'' 27 Conn. Ins. L.J. 185, 201 (2020) ("[i]t was fairly clear at the outset [of the COVID-19 pandemic], particularly when citizens began to stockpile supplies and stay indoors and when governments issued closure orders, that [COVID-19] would have a serious negative impact on many businesses"). We therefore reject this claim.

The plaintiffs also appear to contend that, because an insured loses the use of a property when the property is physically destroyed or physically lost, an insured necessarily suffers the "physical loss" of a property whenever the insured loses the productive use of the property.[16] We disagree. Instead, we agree with the multiplicity of courts that have concluded that "use of property" and "property" are not the same thing, and the loss of the former does not necessarily imply the loss of the latter.[17] See, e.g., *Santo's Italian Café, LLC* v. *Acuity Ins. Co.*, 15 F.4th 398, 402 (6th Cir. 2021) ("A loss of use simply is not the same as a physical loss. It is one thing for the government to ban the use of a bike or a scooter on city sidewalks; it is quite another for someone to steal it."); *GPL Enterprise, LLC* v. *Certain Underwriters at Lloyd's*, 254 Md. App. 638, 654, 276 A.3d 75 (2022) ("[a] loss of use simply is not the same as a physical loss" (internal quotation marks omitted));

---

[16] Because it has no bearing on our analysis, we assume for purposes of this opinion that, because the plaintiffs completely suspended their business operations, they completely lost the use of their properties during some portion of the COVID-19 pandemic. We note, however, that hospitals and many other essential businesses stayed open during the pandemic, albeit with certain restrictions and limitations on their operations, and the record reveals no apparent reason why the plaintiffs also could not have stayed open subject to similar restrictions and limitations. We further note that the plaintiffs make no claim that they lost access to their properties for nonbusiness purposes, such as inspection and maintenance, during the pandemic.

[17] The plaintiffs correctly point out that the right to use property is one stick in the bundle of ownership rights. See, e.g., *Gangemi* v. *Zoning Board of Appeals*, 255 Conn. 143, 151, 763 A.2d 1011 (2001). The plaintiffs' insurance policies do not insure *ownership rights*, however, but *physical property*.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

*North State Deli*, *LLC* v. *Cincinnati Ins. Co.*, 284 N.C. App. 330, 334, 875 S.E.2d 590 (2022) ("[the] [p]laintiffs' desired definition of 'physical loss' as a general 'loss of use' is not supported by our [case law] or the unambiguous language in the [p]olicies"); *Consolidated Restaurant Operations, Inc.* v. *Westport Ins. Corp.*, 205 App. Div. 3d 76, 86, 167 N.Y.S.3d 15 ("[the] inability to operate the property as intended is not discernable, direct physical damage or loss to . . . property, but rather an external force limiting [the] use of the property"), appeal granted in part, 39 N.Y.3d 943, 198 N.E.3d 788, 177 N.Y.S.3d 545 (2022).[18] Indeed, this argument is

---

[18] We note that there is authority to the contrary. See *Derek Scott Williams*, *PLLC* v. *Cincinnati Ins. Co.*, 522 F. Supp. 3d 457, 461, 463 (N.D. Ill. 2021) ("a reasonable [fact finder] could find that the term 'physical loss' is broad enough to cover . . . a deprivation of the use of . . . business premises" as result of COVID-19 pandemic)); *US Airways, Inc.* v. *Commonwealth Ins. Co.*, 64 Va. Cir. 408, 410, 415 (2004) (losses incurred when federal government shut down airports after September 11, 2001 terrorist attacks were covered by civil authority provision of insurance policy), rev'd on other grounds sub nom. *PMA Capital Ins. Co.* v. *US Airways, Inc.*, 271 Va. 352, 626 S.E.2d 369 (2006). In our view, the court in *Derek Scott Williams*, *PLLC*, incorrectly shifted the modifier "physical" from the word "loss" to the word "property." In other words, the court seems to have concluded that, if an insured is deprived by *any* mechanism, physical or otherwise, of the use of its physical property, there has been a "physical loss" of property. We believe that the better reading of the term "physical loss of . . . [p]roperty" is that the *cause of loss* must be physical. See *Oral Surgeons, P.C.* v. *Cincinnati Ins. Co.*, supra, 2 F.4th 1144 ("there must be some physicality to the *loss or damage* of property" (emphasis added)).

In *US Airways, Inc.* v. *Commonwealth Ins. Co.*, supra, 64 Va. Cir. 408, the policy covered "the loss sustained during the period of time, not to exceed [thirty] consecutive days when, as a direct result of a peril insured against, access to real or personal property is prohibited by order of civil or military authority." (Internal quotation marks omitted.) Id., 409. "Perils insured against" was defined as "all risk of direct physical loss of or damage to property described herein . . . ." (Internal quotation marks omitted.) Id. The court rejected the defendant insurance company's contention that physical damage to the property was a prerequisite to coverage under the civil authority provision. Id., 415. In our view, the court's interpretation is not supported by the language of the policy. In any event, the plaintiffs in the present case make no claim that a direct physical loss is not a prerequisite to coverage under their policies.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

inconsistent with the plain language of these policies because, if loss of use constituted direct physical loss, then the policies would cover losses whenever a policyholder experienced a "necessary suspension of [its] 'operations,' " which they do not. Instead, they condition such coverage on a direct physical loss of property.

The plaintiffs further contend that their claim that they suffered a "direct physical loss" is supported by the fact that, according to them, they were required "to undertake demonstrable, physical repairs to the properties to bring them back into use." They claim that "[t]hese 'repairs' included the erection of physical barriers within [their medical] practices, the purchase of additional personal protective equipment, and other efforts to achieve and maintain a safe environment for patients despite the ongoing presence of the pandemic in the community." This claim mirrors the plaintiffs' claim that their properties underwent a "physical transformation" as the result of the COVID-19 pandemic, which we have already rejected. We conclude that, just as the properties were not physically altered in any way by the COVID-19 pandemic, the plaintiffs' activities designed to prevent the transmission of the coronavirus on the properties were not "repairs" in any ordinary sense of the word. Numerous courts have reached the same conclusion. See, e.g., *Mudpie, Inc.* v. *Travelers Casualty Ins. Co. of America*, 487 F. Supp. 3d 834, 840 (N.D. Cal. 2020) ("[t]he words [r]ebuild, repair and replace all strongly suggest that the damage contemplated by the [p]olicy is physical in nature" (internal quotation marks omitted)), aff'd, 15 F.4th 885 (9th Cir. 2021).[19]

[19] See also *Glynn Hospitality Group, Inc.* v. *RSUI Indemnity Co.*, Docket No. 21-cv-10744-DJC, 2021 WL 5281616, *5 (D. Mass. November 12, 2021) ("[t]he terms 'repaired, rebuilt or replaced' suggest tangible damage to property"); *Dukes Clothing, LLC* v. *Cincinnati Ins. Co.*, Docket No. 7:20-cv-860-GMB, 2021 WL 1791488, *3 (N.D. Ala. May 5, 2021) (rejecting attempt to "shoehorn cleaning or disinfecting into the definitions of repair, rebuild, and replace" because "repair" is defined as "[t]o restore (a damaged, worn,

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

The plaintiffs also cite multiple cases that they contend support their claims that a property need not be physically or tangibly altered in order to constitute a "direct physical loss." We agree with the plaintiffs to the extent that they contend that a "direct physical loss" of a property need not always entail physical or tangible *alteration.* For example, as several courts have pointed out, a property that has been stolen has been physically lost even if its physical condition has not changed. See, e.g., *Santo's Italian Café, LLC* v. *Acuity Ins. Co.*, supra, 15 F.4th 404 (applying Ohio law); *Connecticut Children's Medical Center* v. *Continental Casualty Co.*, 581 F. Supp. 3d 385, 389–91 (D. Conn. 2022) (applying Connecticut law), appeal filed (2d Cir. February 17, 2022) (No. 22-322); *Chief of Staff, LLC* v. *Hiscox Ins. Co.*, supra, 532 F. Supp. 3d 602 (applying Connecticut law); *Verveine Corp.* v. *Strathmore Ins. Co.*, supra, 489 Mass. 545 (applying Massachusetts law). This is because a stolen property has been rendered *physically* inaccessible to the insured. Several of the cases that the plaintiffs cite in which a property has been deemed to have been subject to a direct physical loss, even though there was no alteration to the property itself, are analogous to the stolen property cases because, in each case, a discrete physical event occurred that created an imminent threat of physical harm to anyone entering the property, thus rendering the property inac-

or faulty object or structure) to good or proper condition by replacing or fixing parts; to mend, fix," and because "[c]leaning and disinfecting do not involve replacing or fixing parts, and a structure is not faulty because it has a contaminated surface that can be decontaminated by cleaning and disinfecting" (internal quotation marks omitted)), aff'd, 35 F.4th 1322 (11th Cir. 2022); cf. *Real Hospitality, LLC* v. *Travelers Casualty Ins. Co. of America*, 499 F. Supp. 3d 288, 295 (S.D. Miss. 2020) ("[T]he [c]ourt reject[ed] [the] [p]laintiff's [claim] . . . that when the [e]xecutive [o]rders are lifted, this would constitute a 'repair' because [the] [p]laintiff's property would be restored to a 'sound state.' . . . This contorted interpretation [was] inconsistent with the plain and [commonsense] meaning of the word 'repair.' " (Citation omitted; footnote omitted.)).

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

cessible or uninhabitable.[20] In the present case, the COVID-19 pandemic was not a discrete physical event, and it did not create a situation in which the properties would pose an imminent danger to anyone who entered them. Rather, any danger would be created by people who gathered within the buildings. Thus, these cases do not support the plaintiffs' position.[21] See *Mudpie, Inc.* v. *Travelers Casualty Ins. Co. of America*, supra, 487 F. Supp. 3d 841 (distinguishing cases in which direct physical loss was found, even though property itself

[20] See *Manpower, Inc.* v. *Ins. Co. of State of Pennsylvania*, Docket No. 08C0085, 2009 WL 3738099, *3 (E.D. Wis. November 3, 2009) (when partial collapse of building did not physically damage portion of building occupied by insured, but civil authorities prohibited occupancy of entire building, insured incurred " 'direct physical loss' " of its interest in property for period that it was unable to occupy building); *Hughes* v. *Potomac Ins. Co. of District of Columbia*, 199 Cal. App. 2d 239, 243, 248–49, 18 Cal. Rptr. 650 (1962) (when landslide left insureds' home "standing on the edge of and partially overhanging a newly formed [thirty foot] cliff," rendering home uninhabitable, but did not physically damage home itself, insureds incurred physical loss of " 'dwelling building' "); *Murray* v. *State Farm Fire & Casualty Co.*, 203 W. Va. 477, 481, 493, 509 S.E.2d 1 (1998) (risk that rocks and boulders from unstable "highwall" above plaintiffs' properties could fall on properties at any time constituted " 'direct physical loss' " to properties because losses "rendering the insured property unusable or uninhabitable . . . may exist in the absence of structural damage to the insured property").

[21] Several other cases cited by the plaintiffs are similarly distinguishable from the present case because they involved a physical alteration of or an imminent physical threat to the properties at issue. See *Hampton Foods, Inc.* v. *Aetna Casualty & Surety Co.*, 787 F.2d 349, 351 (8th Cir. 1986) (" 'direct physical loss' " was incurred when insured was required to remove personal property and inventory from building that was collapsing and to sell items for salvage, and when other personal property was destroyed when building was demolished); *National Ink & Stitch, LLC* v. *State Auto Property & Casualty Ins. Co.*, 435 F. Supp. 3d 679, 686 (D. Md. 2020) ("loss of use, loss of reliability, or impaired functionality [caused by a ransomware attack] demonstrate the required damage to a computer system, consistent with the physical loss or damage to language in the [p]olicy" (emphasis omitted; internal quotation marks omitted)); *Southeast Mental Health Center, Inc.* v. *Pacific Ins. Co., Ltd.*, 439 F. Supp. 2d 831, 838 (W.D. Tenn. 2006) ("physical damage is not restricted to the physical destruction or harm of computer circuitry but includes loss of access, loss of use, and loss of functionality" caused when programming information and custom circuitry were damaged by electrical outage (internal quotation marks omitted)).

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

was not physically altered, from claim involving suspension of business operations during COVID-19 pandemic because, in each case in which physical loss was found, "some outside physical force . . . *induced* a detrimental change in the property's capabilities" (emphasis in original)).

We similarly disagree with the plaintiffs' reliance on several cases in which contamination of a property by harmful substances or bacteria was deemed to be a direct physical loss.[22] These cases are distinguishable

---

[22] See *Motorists Mutual Ins. Co.* v. *Hardinger*, 131 Fed. Appx. 823, 826, 827–28 (3d Cir. 2005) (concluding that physical loss of property occurs when "function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable," and holding that there was genuine issue of material fact as to whether contamination of residential well by e-coli bacteria that sickened residents constituted physical loss (emphasis omitted; internal quotation marks omitted)); *Gregory Packaging, Inc.* v. *Travelers Property Casualty Co. of America*, Docket No. 2:12-cv-04418 (WHW) (CLW), 2014 WL 6675934, *6 (D.N.J. November 25, 2014) (there was no genuine issue of material fact as to whether " 'direct physical loss' " occurred when "[an] ammonia release physically transformed the air within [the insured property] so that it contained an unsafe amount of ammonia . . . [and] render[ed] the [property] unfit for occupancy until the ammonia could be dissipated"); *TRAVCO Ins. Co.* v. *Ward*, 715 F. Supp. 2d 699, 701, 703 (E.D. Va. 2010) (insured suffered "direct physical loss" of residential property when property was rendered uninhabitable as result of defective sheet rock that emitted toxic chemicals that caused illness and corrosion of residence's metallic components), aff'd, 504 Fed. Appx. 251 (4th Cir. 2013); *Yale University* v. *Cigna Ins. Co.*, 224 F. Supp. 2d 402, 412–13 (D. Conn. 2002) ("the contamination of [the insured's] buildings by the presence of friable asbestos and non-intact lead-based paint" requiring removal and abatement constituted covered physical loss); *Western Fire Ins. Co.* v. *First Presbyterian Church*, 165 Colo. 34, 39, 437 P.2d 52 (1968) (when "the accumulation of gasoline around and under" insured property caused it to become "so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous," insured suffered direct physical loss); *Mellin* v. *Northern Security Ins. Co.*,167 N.H. 544, 546, 550, 115 A.3d 799 (2015) ("physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage," and included odor of cat urine emanating from neighboring condominium that created health problem and required remediation); *Largent* v. *State Farm Fire & Casualty Co.*, 116 Or. App. 595, 597–98, 842 P.2d 445 (1992) (when chemicals from production of methamphetamine permeated porous materials such as drapes, carpets, walls, and woodwork,

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

because it was the physical presence of the contaminants at the properties that caused the loss. The plaintiffs in the present case make no claim that their properties were actually contaminated by the coronavirus or that they closed their businesses during the pandemic because the actual presence of the virus made the buildings in which the businesses were located nonfunctional or inherently dangerous to persons who entered them.[23] Rather, they rely on the potential for person to person transmission of the virus within the building. Specifically, they claim that they suspended their business operations because "their properties, in their unrepaired state, had the capacity to cause illness and death by virtue of bringing people into proximity within an interior space, where the transmission of [the coronavirus was] significantly increased." In any event, even if the plaintiffs had claimed that their properties were actually contaminated by the coronavirus, we find persuasive the cases that have held that the virus is not the type of physical contaminant that creates the risk of a direct physical loss because, once a contaminated surface is cleaned or simply left alone for a few days, it no longer poses any physical threat to occupants. See *Kim-Chee, LLC* v. *Philadelphia Indemnity Ins. Co.*, 535 F. Supp. 3d 152, 161 (W.D.N.Y. 2021) ("[u]nlike the cases of gasoline infiltration, cat urine, lead dust, and the other noxious substances [that] courts have found to constitute direct physical losses, there is no allegation of persistent contamination [by the coronavirus] rendering the structure unusable"), aff'd, Docket No. 21-1082-cv, 2022 WL 258569 (2d Cir. January 28, 2022); see also id. (noting that coronavirus poses "a mortal hazard to humans, but little or none to buildings which

insured suffered direct physical loss of property), review denied, 316 Or. 528, 854 P.2d 940 (1993).

[23] Accordingly, we need not consider whether losses caused by the actual presence of the coronavirus on their properties would be subject to the virus exclusion.

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

remain intact and available for use once the human occupants no longer present a health risk to one another").[24] Indeed, the plaintiffs have not alleged that the risk of transmission from a surface contaminated with the coronavirus is significant even before cleaning or the lapse of time.[25]

---

[24] See also *Kim-Chee, LLC* v. *Philadelphia Indemnity Ins. Co.*, Docket No. 21-1082-cv, 2022 WL 258569, *2 (2d Cir. January 28, 2022) ("[the] inability [of the coronavirus] to physically alter or persistently contaminate property differentiates it from radiation, chemical dust, gas, asbestos, and other contaminants [the] presence [of which] could trigger coverage"); *Connecticut Children's Medical Center* v. *Continental Casualty Co.*, supra, 581 F. Supp. 3d 392 ("To the extent that [the plaintiffs] allege that [coronavirus] particles affix themselves temporarily to interior portions of their physical property, they do not explain how it is plausible to conclude that this amounts to damage to the property. Indeed, the plaintiffs are medical providers whose role is to treat sick people (including patients with COVID-19), not to file property damage claims every time a sick person coughs, sneezes, or otherwise respirates or expectorates at their premises." (Internal quotation marks omitted.)); *Inns by the Sea* v. *California Mutual Ins. Co.*, supra, 71 Cal. App. 5th 704 (coronavirus does not "cause damage to the property necessitating rehabilitation or restoration efforts similar to those required to abate asbestos" (internal quotation marks omitted)); *State & 9 Street Corp.* v. *Society Ins.*, Docket No. 1-21-1222, 2022 WL 2379361, *8 (Ill. App. June 30, 2022) ("[although] the impact of the [coronavirus] on the world over the last year and a half can hardly be overstated, its impact on physical property is inconsequential: deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days" (internal quotation marks omitted)); *AC Ocean Walk, LLC* v. *American Guarantee & Liability Ins. Co.*, Docket No. A-1824-21, 2022 WL 2254864, *13 (N.J. Super. App. Div. June 23, 2022) ("[w]hereas certain quantities of asbestos and ammonia in the air require extensive remediation before making a property fit for humans, the [coronavirus] can be eliminated from surfaces with household cleaning products and dissipates on its own"). But see *Huntington Ingalls Industries, Inc.* v. *Ace American Ins. Co.*, Docket No. 2021-173, 2022 WL 4396475, *3, *14 (Vt. September 23, 2022) ("under Vermont's extremely liberal pleading standards," allegation that property was contaminated with coronavirus adequately alleged direct physical damage for purposes of surviving motion for judgment on pleadings).

[25] We presume that this is because such an allegation would be inconsistent with now established guidance from the United States Centers for Disease Control and Prevention. See Centers for Disease Control and Prevention, Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments (April 5, 2021), available at https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmis-

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

We finally address the plaintiffs' argument that this court's decisions in *Beach* v. *Middlesex Mutual Assurance Co.*, 205 Conn. 246, 532 A.2d 1297 (1987), and *Karas* v. *Liberty Ins. Corp.*, 335 Conn. 62, 228 A.3d 1012 (2019), support their claim that the phrase "direct physical loss" is broad enough to include the losses that they incurred when they suspended their business operations during the COVID-19 pandemic. In *Beach*, this court considered whether the word " 'collapse,' " as used in a homeowners insurance policy, included the structural deterioration of a foundation caused by settling. *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 247. The insurance company contended that the word " 'collapse' . . . unambiguously connotes a sudden and complete catastrophe." Id., 250. This court disagreed and concluded that the definition of "collapse" reasonably could be interpreted to include "a breakdown or loss of structural strength . . . ." Id., 251. The court further observed that, "[i]f the [insurance company] wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it . . . claims to have intended." Id.

Similarly, in the more recent *Karas* v. *Liberty Ins. Corp.*, supra, 335 Conn. 65, we considered whether the cracking and crumbling of concrete basement walls as the result of defective concrete constituted a " 'collapse' " under the plaintiffs' homeowners insurance policy. The insurance company contended that the policy at issue was materially different from the policy at issue in *Beach* because it expressly provided that "[c]ollapse does not include settling, cracking, shrinking, bulging

_____

sion.html (last visited January 26, 2023) ("The principal mode by which people are infected with SARS-CoV-2 (the virus that causes COVID-19) is through exposure to respiratory droplets carrying infectious virus. It is possible for people to be infected through contact with contaminated surfaces or objects (fomites), but the risk is generally considered to be low." (Emphasis omitted.)).

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

or expansion.'' (Internal quotation marks omitted.) Id.,
78. This court concluded that, although the policy clearly
did not cover a loss caused by ''*mere* settling''; (empha-
sis in original; internal quotation marks omitted) id.,
79; the policy was ambiguous as to whether it covered
''a far more serious structural infirmity culminating in
an actual or imminent collapse'' and, therefore, must
be construed in favor of the insured. Id., 78. As in *Beach*,
we observed that, ''if the [insurance company] had wished
to limit its collapse coverage to a sudden and cata-
strophic event, it very easily could have done so in plain
and unambiguous terms.'' Id., 79.

The plaintiffs in the present case contend that, ''[j]ust
as in *Beach* and *Karas*, if the [defendants] had wished
to limit their coverage obligations under the policies to
'tangible alteration,' they could have drafted the policies
that way.'' Unlike the word ''collapse,'' however, we
have concluded that the phrase ''direct physical loss of
. . . [p]roperty'' is unambiguous as applied to losses
incurred as the result of the suspension of business
operations during the COVID-19 pandemic.[26] See *ENT &
Allergy Associates, LLC* v. *Continental Casualty Co.*,
Docket No. 3:21CV00289 (SALM), 2022 WL 624628, *9
(D. Conn. March 3, 2022) (''Crucially . . . in [both

---

[26] The plaintiffs' contention that the phrase ''direct physical loss'' is ambigu-
ous as applied to their claims because the insurance policies at issue are
''all-risk'' policies is unavailing. Although an all-risk policy ''covers every
kind of insurable loss except what is specifically excluded''; (internal quota-
tion marks omitted) *Hair Studio 1208, LLC* v. *Hartford Underwriters Ins.
Co.*, 539 F. Supp. 3d 409, 415 (E.D. Pa. 2021), appeal filed (3d Cir. June 15,
2021) (No. 21-2113); ''[a]ll-risk is not synonymous with all loss,'' and an all-
risk policy does not cover losses—such as those caused by suspension of
business operations during the COVID-19 pandemic—that do not fall within
the coverage clause merely because they also do not fall within any excep-
tion. (Internal quotation marks omitted.) Id., 416; see *Kim-Chee, LLC* v.
*Philadelphia Indemnity Ins. Co.*, supra, 535 F. Supp. 3d 157, 161 (''[i]t has
long been recognized . . . that all-risk does not mean all-loss,'' and risk of
loss due to suspension of business operations during COVID-19 pandemic
is not risk of ''direct physical loss'' (internal quotation marks omitted)).

Connecticut Dermatology Group, PC *v.* Twin City Fire Ins. Co.

*Beach* and *Karas*] the court found that the relevant contractual language was ambiguous before adopting the plaintiff's proposed interpretation. To the contrary . . . the term 'direct physical loss of or damage to property' is unambiguous under the [p]olicies [as applied to losses resulting from the suspension of business operations during the COVID-19 pandemic]." (Emphasis omitted.)), appeal filed (2d Cir. April 1, 2022) (No. 22-697).

In reaching this conclusion, we do not suggest that the plaintiffs' interpretation is entirely frivolous. Indeed, we are mindful that, given the limits and fluidity of language and the complexity of insurance policies, virtually any policy provision, at least considered in isolation, may be subject to multiple nonfrivolous interpretations. As we have indicated, however, "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Afkari-Ahmadi* v. *Fotovat-Ahmadi*, supra, 294 Conn. 391. Rather, ambiguity exists only when the term is susceptible to more than one reasonable interpretation after the contract is "viewed in its entirety, with each provision read in light of the other provisions . . . and every provision . . . given effect if it is possible to do so." (Internal quotation marks omitted.) *Enviro Express, Inc.* v. *AIU Ins. Co.*, supra, 279 Conn. 199. We conclude that, considered in light of the entire contract, the plaintiffs' interpretation that the coverage provision for "direct physical loss of . . . [p]roperty" applies to their claims—even though there has been no physical, tangible alteration of their properties, no persistent, physical contamination of the properties rendering them uninhabitable, and no imminent threat of physical damage to or destruction of the properties rendering them unusable or inaccessible— is not reasonable. We therefore conclude that there was no genuine issue of material fact as to whether the

insurance policies did not cover the plaintiffs' claims because the plaintiffs suffered no "direct physical loss of . . . [p]roperty . . . ." Accordingly, we affirm the judgment of the trial court on this alternative ground.

The judgment is affirmed.

In this opinion the other justices concurred.